LAPHAM-HICKEY STEEL CORPORATION, Plaintiff-Appellant, v. NATIONAL SURETY CORPORATION, Defendant-Appellee.

First District (6th Division)   No. 1—92—1764

Opinion filed April 29, 1994, *nunc pro tunc* March 31, 1994.

Geoffrey G. Gilbert and William J. Cooney, both of McBride, Baker & Coles, of Chicago, for appellant.

Katherine E. Rakowsky and Jonathan Feiger, both of Grippo & Elden, of Chicago, for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Lapham-Hickey Steel Corporation (Lapham-Hickey) filed a declaratory judgment action against its insurer, National Surety Corporation (National Surety). The suit alleged that under the comprehensive general liability policies (policies) issued to Lapham-Hickey, National Surety owed a duty to defend with respect to potential liability for environmental pollution. The court entered summary judgment in favor of National Surety finding that Lapham-Hickey was neither sued nor subjected to a substantial threat of litigation sufficient to trigger the duty to defend under the policies.

The issue on appeal is whether Lapham-Hickey was subjected to action sufficiently adversarial and coercive in nature to trigger the duty to defend. The parties agree that neither the material facts nor the inferences to be drawn are in dispute and that resolution of the issue involves a question of law.

From about 1912 to 1962 the Valentine-Clark Company operated a plant in St. Paul, Minnesota (the site), using creosote, fuel oil and PCP as wood preservatives, primarily for treating telephone poles. Over the years these substances contaminated the soil and ground water. In 1985 Lapham-Hickey acquired the site without knowledge of the contamination. Later, St. Paul Steel Company became interested in purchasing the site from Lapham-Hickey, conducted an investigation and in 1987 discovered the contamination. Shortly thereafter, Lapham-Hickey was notified that the Environmental Protection Agency (EPA) and the Minnesota Pollution Control Agency (MPCA) had opened files regarding the site.

In the summer of 1987, the MPCA sent Lapham-Hickey a proposed consent order. The order stated that Lapham-Hickey was a "responsible person" (RP)[1] and requested an investigation and feasibility study. Lapham-Hickey disputed the proposed RP finding but agreed to initiate the remedial investigation/feasibility study. Negotiations continued between Lapham-Hickey and the MPCA, and in March 1988 the parties agreed that a "no action" letter would serve their respective interests. The letter, issued on June 8, 1988, stated in pertinent part:

> "The MPCA has made no determination as to whether or not Lapham-Hickey Steel is a responsible person (Responsible Person) within the meaning of Section 115B.03 of the Minnesota Environmental Response and Liability Act (MERLA). However, as discussed in a meeting between representatives of Lapham-Hickey Steel and the MPCA staff on March 14, 1988, based on the information currently available regarding site usage and ownership history,[2] the MPCA staff does not believe that Lapham-Hickey Steel is a Responsible Person with respect to any hazardous substance, pollutant or contaminant at the site. Accordingly, based upon the facts presented, the staff does not intend to recommend any enforcement action to the Agency, regarding any claim for liability against Lapham-Hickey as a Responsible Person within the meaning of MERLA."

In exchange for the "no action" letter, Lapham-Hickey agreed to conduct a thorough investigation into the nature and extent of the pollution at the site. Lapham-Hickey's environmental consultant began that investigation in the summer of 1988 and submitted a final report to Lapham-Hickey and the MPCA in January 1989. The report confirmed the existence of environmental pollution at the site.

The MPCA did not make any further demands or initiate any enforcement action. The EPA requested access to the property and in October 1987, it issued a site inspection report concluding that the site was contaminated. That report was the last communication Lapham-Hickey received from the EPA.

---

[1] Under the Minnesota Environmental Response and Liability Act (MERLA) a "responsible person" is "strictly liable, jointly and severally, for *** response costs and damages which result from the release or threatened release" of a hazardous substance. 9 Minn. Stat. Ann. § 115B.04 (West 1987).

[2] Under MERLA, an owner who acquired title after all of the polluting events took place is not an RP (and not liable under the statute) unless he "knew or reasonably should have known" about the pollution at the time he acquired title and "engaged in conduct associating (himself) with the release" of the pollution. 9 Minn. Stat. Ann. § 115B.03(3)(d) (West 1987).

The language of the policies at issue provides that National Surety "shall have the right and duty [to] defend any *suit* against the insured." (Emphasis added.) The common and ordinary meaning of "suit" is "the prosecution of a *** claim or action before a tribunal authorized to hear such claims or actions." (*Community Unit School District No. 5 v. Country Mutual Insurance Co.* (1981), 95 Ill. App. 3d 272, 279, 419 N.E.2d 1257.) Although it is clear that the facts *sub judice* do not amount to a suit, many courts have held that the duty to defend may be triggered by action that is somewhat less than a suit in the traditional sense. See *Ryan v. Royal Insurance Co. of America* (1st Cir. 1990), 916 F.2d 731, 735 (wherein the court stated that to accord "talismanic significance" to the word "suit *** brings to the language of the policy a precision that the drafter omitted and that the parties were not bound to anticipate").

There are several cases where certain actions were held to be the functional equivalent of a suit: *Aire Frio, S.A. v. United States Fidelity & Guaranty Co.* (D. Canal Zone 1970), 309 F. Supp. 1388 (proceedings before industry board of contract appeal); *Madawick Contracting Co. v. Travelers Insurance Co.* (1954), 307 N.Y. 111, 120 N.E.2d 520 (arbitration proceedings); *Community Unit School District*, 95 Ill. App. 3d 272 (actions before administrative agencies); *Avondale Industries, Inc. v. Travelers Indemnity Co.* (2d Cir. 1989), 887 F.2d 1200; and *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 535 N.E. 2d 1071 ("potentially responsible person" letters).

The rationale of these cases is to focus upon substance rather than form. Although the conduct or action held to be the functional equivalent of a suit varies from case to case, the *Ryan* court stated:

> "[N]otwithstanding idiosyncratic differences in nomenclature, case after case insists that, shy of an actual suit, a substantial entry-level burden must be carried before the duty to defend under a CGL policy arises. Most of the cases describe the entry-level burden in terms of coerciveness or adversariness. [Citation.] Almost all of them require, at a bare minimum, some showing of *probable* and *imminent* governmental action as a condition precedent to coverage.
>
> In a variation on this theme, some recent decisions seem to suggest that the duty to defend arises whenever there has been a serious governmental effort to force the insured to take action (or, given a slightly different spin, whenever it becomes clear that there will be serious consequences if the insured fails to act). [Citation.] *** [The focus is] on probabilities, not possibilities; on imminent consequences, not pessimistic speculation about a highly uncertain chain of future events." (Emphasis in original.) *Ryan*, 916 F.2d at 738-39.

In applying these standards to the instant case, we agree with the trial court. The record does not contain any facts, taken in a light most favorable to Lapham-Hickey, which tend to show that it was subjected to a probable and imminent threat of government action. Nor are there any facts which tend to show that the government action involved was adversarial or coercive. Relying on *Specialty Coatings Co.*, Lapham-Hickey notes that it was designated an RP in the consent decree. That order, however, was a *proposed* draft, was never agreed to by Lapham-Hickey, and upon subsequent negotiation the proposed RP language was omitted and replaced with a "no action" letter specifically stating:

> "[T]he MPCA staff does not believe that Lapham-Hickey Steel is a Responsible Person with respect to any hazardous substance, pollutant or contaminant at the site. Accordingly, based upon the facts presented, the staff does not intend to recommend any enforcement action to the Agency, regarding any claim for liability against Lapham-Hickey as a Responsible Person within the meaning of MERLA."

Simply put, Lapham-Hickey, without citing any authority, contends that mere ownership of contaminated property coupled with government knowledge is sufficient to trigger a duty to defend. *Specialty Coatings Co.* (180 Ill. App. 3d 378) (where the insured did receive an RP letter) certainly does not stand for this proposition. Moreover, a similar contention was rejected in *Ryan*, wherein the court stated:

> "[C]onceding the absence of any suit or formal administrative proceeding, appellants argue that the duty to defend arises whenever a state agency takes the position that an environmental condition requires remediation and notifies the policyholder to that effect. This hypothesis, we think, bends the policy language well past the breaking point." *Ryan*, 916 F.2d at 736.

In concluding as we do, we are cognizant of the First District, Third Division's decision in *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.* (1994), 262 Ill. App. 3d 400, which was issued one day prior to this decision. Although the result in *Protection Mutual Insurance Co.* is contrary to the instant case, we are not persuaded by the reasoning set forth in that opinion.

Based upon the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA, P.J., and EGAN, J., concur.