In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-3412

KEYSTONE CONSOLIDATED INDUSTRIES, INC.,
and VALHI, INC.,

*Plaintiffs-Appellants*,

*v.*

EMPLOYERS INSURANCE COMPANY
OF WAUSAU (F/K/A EMPLOYERS MUTUAL LIABILITY
INSURANCE COMPANY OF WISCONSIN),

*Defendant-Appellee*.

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 03-01201 5292—**Michael M. Mihm**, *Judge*.

---

ARGUED JANUARY 17, 2006—DECIDED AUGUST 3, 2006

---

Before CUDAHY, POSNER, and WOOD, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Keystone Consolidated Industries, Inc., and Valhi, Inc.[1] (collectively, Keystone) operate a number of mills that manufacture wire products, chemicals and other industrial materials, and have done so in some capacity since the early 1900s. Beginning in 1942 and

---

[1] In 1984, Keystone spun off some of its businesses, facilities and assets, including coverage rights associated with the transferred facilities, to a predecessor of Valhi.

continuing through the late 1980s, Keystone purchased dozens of comprehensive general liability and excess umbrella insurance policies from Employers Insurance Company of Wausau (Wausau). Keystone seeks indemnification from Wausau for approximately $13.5 million, which represents the costs it has incurred or expects to incur cleaning up environmental damage that its operations caused at four sites in Illinois and Indiana. Wausau has refused to indemnify Keystone on the theory that the policies require indemnification only when a lawsuit triggers its duty to defend. The district court agreed with Wausau and granted its motion for summary judgment. Because, under Illinois law, the duty to indemnify may arise even in absence of a lawsuit triggering the duty to defend, we reverse the judgment of the district court and remand for further proceedings.

## I. Background

Four of Keystone's industrial sites are at issue in this case: Peoria, Impex, Chicago Steel & Wire and Ninth Avenue. Keystone has requested indemnification from Wausau for costs associated with cleaning up groundwater and other contamination at each site. The Peoria Site constitutes the most extensive claim by far; the others involve only a fraction of the Peoria Site's cleanup costs. We summarize the relevant facts about each site and its attendant claims and costs below.

Keystone opened a wire mill near Peoria, Illinois in 1901. This wire mill, which is one of the largest in North America, draws and finishes wire products such as fence materials and nails. In 1917, Keystone opened a steel mill, which produces steel rod coils, at the same facility in Peoria.

Keystone began to use chlorinated solvents, including trichloroethylene (TCE), in vapor degreasing cabinets to clean nails in the wire mill at the Peoria Site in 1958. By

the 1960s, Keystone was using four such vapor degreasing cabinets. Around 1976, Keystone switched from TCE to another chlorinated solvent known as 1, 1, 1—trichloroethane (TCA). Keystone abandoned the chlorinated solvents and converted to water-based cleaning agents in 1993.

During the time that Keystone used the chlorinated solvents in its degreasing cabinets, it—as part of the cleaning process—discharged wastewater containing spent pickle liquor, which is sulfuric acid used to clean steel rods for wire drawing. Because spent pickle liquor contains lead and chromium, the U.S. Environmental Protection Agency (U.S. EPA) has designated it a hazardous waste (known as K062). 40 C.F.R. § 261.32 and Part 261 App. VII (2006).

On July 18, 1986, the United States filed a complaint against Keystone alleging that its Peoria Site violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6901-7000 (2006) (RCRA) and seeking to enjoin it from depositing spent pickle liquor into earthen impoundments at the site. On June 29, 1988, Keystone entered into a consent decree with the United States. In that consent decree, Keystone agreed to pay a civil penalty and to close its spent pickle liquor impoundments pursuant to a plan it would negotiate with the Illinois Environmental Protection Agency (IEPA). During a 1988 sampling required for the closing of the spent pickle liquor impoundments, Keystone discovered TCE and TCA contamination (collectively, the TCE contamination) in the groundwater beneath the Peoria Site.

On October 31, 1989, Keystone began the installation and sampling of twenty-six groundwater monitoring wells to determine the extent of the TCE contamination. Keystone notified Wausau of its potential liability for TCE contamination on November 2, 1989. In 1993, the IEPA filed a complaint and proposed consent decree in Illinois state

court essentially alleging that Keystone failed to meet its obligations under the 1988 consent decree. In 2000, Keystone submitted claims against the Wausau policies seeking indemnification for costs incurred in remediating the TCE contamination. Wausau has thus far refused to pay. Keystone expects to incur a total cost of approximately $11 million in cleaning up the Peoria Site. It has, to date, incurred costs of about $4.5 million.

The Impex Site is a former metal-working plant located in Crawfordsville, Indiana. The National Lock Company, a subsidiary of Keystone, acquired the facility in 1964. While Keystone owned the plant, it used volatile organic compounds (VOCs) for metal cleaning and finishing. Keystone arranged for an environmental assessment of the property in preparation for its proposed sale. This assessment identified VOC contamination of the soil and groundwater exceeding permissible state and federal levels. Keystone submitted a voluntary cleanup plan to the Indiana Department of Environmental Management in 1991. Under that plan, Keystone installed and began to operate both a VOC soil vapor system and a groundwater pump-and-treat system at the Impex Site in 1992.

Keystone's investigation and cleanup costs at the Impex Site exceed $2.1 million. Keystone seeks indemnification from Wausau for expenses incurred and a declaration that Wausau will be liable for future costs.

Keystone acquired the third site, the Chicago Steel & Wire Site, in 1964. During a site investigation in 2000, Keystone discovered VOC and lead contamination in the soil and groundwater. Keystone notified the IEPA of its findings and enrolled the site in Illinois' pre-notice environmental remediation program. The IEPA approved Keystone's remediation in August 2002. Keystone incurred a total of about $500,000 relating to this remediation and seeks indemnification for those and future costs.

The final site relating to this lawsuit is the Ninth Avenue Site, a former waste disposal site located in Gary, Indiana. Keystone transferred spent pickle liquor from the Chicago Steel & Wire Site to the Ninth Avenue Site for disposal between April 30, 1973, and November 6, 1975. In 1989, the U.S. EPA ordered Chicago Steel & Wire and other potentially responsible parties to investigate and remediate the site. Keystone has incurred costs of approximately $1.1 million to date to remediate the Ninth Avenue Site.

The district court granted Wausau's motion for summary judgment, concluding: (1) that Illinois courts require the filing of a formal complaint in a court of law to trigger the "duty to defend" clause of a comprehensive general liability insurance contract; and (2) that where there is no duty to defend, there will be no duty to indemnify. Keystone timely appealed and now seeks a reversal of summary judgment so that it may proceed to trial. Keystone also argues that, even if Illinois law requires a lawsuit to trigger an insurer's duty to indemnify, the IEPA's 1993 complaint alleging that Keystone failed to prevent and remediate the TCE contamination satisfies that standard for the Peoria Site.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). Federal jurisdiction in this case rests upon diversity of citizenship. 28 U.S.C. § 1332(a)(1). The parties agree that Illinois law governs the substantive issues underlying the appeal.

## A. *The Duty to Defend and the Duty to Indemnify Under Illinois Law*

The district court concluded that, under Illinois law, where an insurance policy includes both the duty to de-

fend and the duty to indemnify, the duty to indemnify arises only in circumstances involving lawsuits. Proceeding from that conclusion, the district court then reasoned that since the insurance policies at issue contain both duties, Keystone's indemnity rights must be limited to claims involving lawsuits. Both steps of the district court's reasoning, however, are erroneous. First, although some authority suggests otherwise,[2] it appears fairly well settled that under Illinois law, an insurance policy may

---

[2] There appears to be some confusion in the Illinois courts on this point, which seems to stem primarily from *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073 (Ill. 1993). In *Crum & Forster Managers Corp.*, the Illinois Supreme Court said that "[c]learly, where there is no duty to defend, there will be no duty to indemnify." *Id.* at 1081. Taken literally and ignoring context, this statement would seem to preclude indemnification in the absence of a lawsuit under any circumstances. When the statement is read in context, however, it becomes evident that Illinois law is significantly more nuanced. *See generally Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206 (Ill. 2004); *Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417 (7th Cir. 2005). The statement, as originally appearing in *Crum & Forster Managers Corp.*, was intended to summarize a more complex, case-specific, proposition: the insurer was not obligated to defend or indemnify the insured because those obligations arise only under circumstances stated in the policy. 620 N.E.2d at 1081; *see also Sokol & Co.*, 430 F.3d at 420-21. Under the facts of *Crum & Forster Managers Corp.*, the activities for which the insured sought indemnification could *never* have fallen within the stated coverage of the policy. 620 N.E.2d at 1081. In fact, the only case we find that takes the proposition literally and at face value seems to be an anomaly. *Zurich Ins. Co. v. Carus Corp.*, 689 N.E.2d 130, 133 (Ill. Ct. App. 1997) (concluding, without analysis, that the duty to indemnify hinged on the duty to defend); *Sokol & Co.*, 430 F.3d at 421 n.1. Given this context, it becomes apparent that *Crum & Forster Managers Corp.* does not establish a bright-line rule to preclude indemnification in the absence of a lawsuit.

entitle the insured to indemnification for claims that do not arise from the resolution of a lawsuit, so long as those claims satisfy any requirements set forth in the relevant provisions of the policy. *See Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 215-18 (Ill. 2004) (*CILCO*); *see also Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 420-21 (7th Cir. 2005). Second, the language of Keystone's policies arguably supports a conclusion that Wausau has a duty to indemnify Keystone that is independent of its duty to defend.

An insurer's most fundamental duty under its insurance contracts is its duty to indemnify—that is, its duty either to reimburse the insured for losses it incurs directly or to pay sums that the insured becomes legally obligated to pay to others. ALAN D. WINDT, INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 6:1 (4th ed. Supp. 2006). An insurer's duty to indemnify often involves its duty to defend the insured in the event of a lawsuit or its functional equivalent. *Id.* § 4:1; *Lapham-Hickey Steel Corp. v. Nat'l Surety Corp.*, 633 N.E.2d 199, 201 (Ill. Ct. App. 1994). But although the duties to defend and to indemnify may be related, they are not necessarily mutually dependent or coextensive. *See, e.g.*, *Sokol & Co.*, 430 F.3d at 421 ("[W]hile the duty to indemnify may sometimes nest inside the duty to defend, that will not always be the case.").

Moreover, the fact that the duty to defend is generally broader than the duty to indemnify does not mean, as the district court believed, that where there is no duty to defend there can be no duty to indemnify. The duty to defend is *generally* broader because it arises in cases of arguable or potential coverage. That is, an insured need only put the insurer on notice of the claim in order to trigger the insurer's duty to defend. WINDT § 4:1. The duty to indemnify, however, arises only in circumstances of *actual* coverage; if the insurance policy does not cover what is alleged in the

claim, the insurer will not have a duty to indemnify based on that claim. *Crum & Forster Managers Corp. v. Resolution Trust Co.*, 620 N.E.2d 1073, 1081 (Ill. 1993); *see also Sokol & Co.*, 430 F.3d at 421.

But these characteristics do not lead to the conclusion that the factors required to trigger the generally broader duty to defend are always required to trigger the duty to indemnify. In many circumstances, the duty to indemnify explicitly involves the duty to defend a lawsuit or its functional equivalent. In other cases, however, the duty to indemnify is separate from and independent of the duty to defend. In short, while a lawsuit may be sufficient to trigger an insurer's duty to indemnify, it is not a *necessary* condition under Illinois law.

Given these conclusions, the next logical question is what is required to trigger an employer's duty to indemnify. The answer to that question is found in the language of the policies. Under Illinois law, construction of insurance policies is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). Policies will be construed as a whole; if the words used in the policies are clear, then they must be given their "plain, ordinary, and popular meaning." *CILCO*, 821 N.E.2d at 213 (citing *Outboard Marine Corp*, 607 N.E.2d at 1212). With those principles in mind, we turn next to the Wausau policies.

## B.   The Wausau Policies

Keystone purchased both general liability and excess umbrella policies from Wausau beginning in 1942 and continuing through 1987. The general liability policies cover Keystone from 1942 into the 1980s; the excess umbrella policies cover Keystone from 1969 through 1979. Although each of the general liability and excess umbrella policies is somewhat unique, Wausau used two basic insuring agree-

ments for the general policies and two basic insuring agreements for the excess umbrella policies.

Each of Keystone's general liability policies contains a duty-to-defend provision requiring Wausau to defend any "suit" against the insured "seeking damages" on account of property damage. Keystone concedes that under these general liability policies, Wausau's obligation to defend is triggered only by the filing of a "suit." The term "suit," under Illinois law, "requires the commencement of some action in a court of law before an insurer's duty to defend is triggered." *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 847 (Ill. 1995).

But, as earlier explained, the fact that Wausau's duty to defend does not arise unless a lawsuit is filed does not mean that Wausau's duty to indemnify depends on the filing of that lawsuit. In fact, the policies here support a conclusion that the duty to indemnify is separate and independent. The pre-1968 general liability policies grant Keystone coverage for property damage so long as the liability is "imposed by law" and is "caused by accident."[3] The 1969-1985 general liability policy language changed slightly, in that liability under these policies are based on an "occurrence" rather than on an "accident." Under the general liability policies, Wausau pledged to "pay on behalf of the insured all sums which the insured shall

---

[3] Both Keystone and Wausau reproduce the relevant policy language in their briefs. The specific language of the pre-1968 policies states that:

> To pay on behalf to the insured all sums which the insured shall become obligated to pay by reason of liability imposed upon him by law or assumed by him under any written contract for damages, because of injury to or destruction of property, including the loss of use thereof, caused by accident.

(Appellant's Br. 5; Appellee's Br. 13.)

become legally obligated to pay as damages because of"
bodily injury or property damage "caused by an occurrence."
The policy further states that Wausau "shall have the right
and duty to defend any suit against the insured seeking
damages" on account of bodily injury or property damage
"and may make such investigation and settlement of any
claim *or* suit" but Wausau "shall not be obligated to pay any
claim or judgment *or* to defend any suit after the applicable
limit of the company's liability has been exhausted by
payment of judgments or settlements" (emphasis added).

To unpack that language a bit, although the general
liability policies base Wausau's obligation to defend not
illogically on the filing of a "suit," the indemnity terms
require Wausau to "pay on behalf of the insured all sums
which the insured shall become legally obligated to pay
as damages."[4] In addition, the indemnity terms also state
that Wausau "shall not be obligated to pay any claim or
judgment" once the policy limits are exhausted. The
disjunctive reference to claims *or* judgments is significant;

---

[4] The full text of the 1969-1985 policies reads:

> The company will pay on behalf of the insured all sums which
> the insured shall become legally obligated to pay as damages
> because of
>
> > Coverage A, bodily injury or
> >
> > Coverage B, property damage
>
> to which this insurance applies, caused by an occurrence, and
> the company shall have the right and duty to defend any suit
> against the insured seeking damages on account of
> such bodily injury or property damages, even if any of the
> allegations of the suit are groundless, false or fraudulent, and
> may make such investigation and settlement of any claim or
> suit as it deems expedient, but the company shall not be
> obligated to pay any claim or judgment or to defend any suit
> after the applicable limit of the company's liability has been
> exhausted by payment of judgments or settlements.

(Appellant's Br. 6-7; Appellee's Br. 14.)

it lends some support to reasoning that a lawsuit is not necessary to trigger the duty to indemnify. If it were, the policies likely would not make a disjunctive reference to "claims."

Keystone's excess umbrella policies likewise indicate that Wausau's duty to indemnify is separate from and independent of the duty to defend. The 1969-71 excess umbrella policies require Wausau to pay on Keystone's behalf "all sums" which Keystone becomes obligated to pay "by reason of liability imposed . . . by law." The policies define "sums" as the insured "loss." The policies also expressly provide that defense costs for *either* "claims" *or* "suits" are covered, with "expenses" to be included within the definition of "loss."[5]

---

[5]  The 1969-1971 excess umbrella policies provide that:

Wausau agrees:

> COVERAGE. To pay on behalf of the insured all sums which the insured shall become obligated to pay, either by adjudication or compromise, by reason of the liability imposed upon the insured by law or assumed by the insured under any contract for damages because of personal injury and property damage, and all expenses incurred by the insured or the company, hereinafter called "loss."

> The term "expenses" as used herein shall mean expenses incurred by the insured or the company in connection with the investigation, negotiation, adjustment, settlement and defense of any claims or suits alleging personal injury or property damage and seeking damages which are payable under the terms of this policy.

> . . .

> It is agreed that with respect to any occurrence not covered by the underlying insurance, but covered by

(continued...)

The 1972-79 excess umbrella policies require Wausau to pay "all sums in excess of the retained limit which the insured shall become legally obligated to pay . . . as damages because of . . . property damage." Additionally, the policies require Wausau to pay Keystone's defense costs once the primary coverage is exhausted for claims or suits.[6]

---

[5] (...continued)

> the terms and conditions of this policy except for the amount of the retained limit, the company shall:
>
>> (A) Defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof . . . .

(Appellant's Br. 9; Appellee's Br. 15-16.)

[6] The 1972-1979 excess umbrella policies provide that:

> Wausau agrees:
>
>> I. COVERAGE. To pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company agrees to pay, as damages because of
>>
>>> Coverage A—Personal Injury,
>>>
>>> Coverage B—Property Damage, or
>>>
>>> Coverage C—Advertising Injury
>>
>> To which this policy applies arising out of an occurrence.
>>
>> II. INVESTIGATION, DEFENSE, SETTLEMENT, ASSISTANCE AND COOPERATION. With respect to any claim or suit seeking damages payable under this policy and for which no defense is provided by underlying insurance of by any other valid and collectible insurance available to the insured,
>>
>>> (A) The Company may elect, but shall not be required, to assume the investigation, defense or settlement of such claim or suit, or
>>>
>>> (B) In the absence of such election by the company, the insured shall arrange for and assume the inves-

(continued...)

Both the 1969-71 and the 1972-79 excess umbrella policies refer to claims *or* suits. Once again, the disjunctive "or" is significant. Its inclusion suggests that claims are to be distinguished from "suits." This language suggests that, under the excess umbrella policies, Wausau's duty to defend, like its duty to indemnify, may be triggered by something less than a lawsuit.

The excess umbrella policies here are fundamentally different from policies imposing a duty to defend only in the event of lawsuits. If Wausau is correct that its duty to defend requires a formal suit, then the reference to "claims" would be mere surplusage, which is problematic. It is well settled that reviewing courts will give meaning to each term in an insurance policy. *See CILCO*, 821 N.E.2d at 214. There is a colorable argument, then, that the excess umbrella policies impose upon Wausau a duty to defend not only in the event of lawsuits but also in the event of claims not taking the form of suits. If, under the excess umbrella policies, a lawsuit is not necessary to trigger Wausau's duty

---

[6] (...continued)

> tigation, defense or settlement of such claim or suit . . .
>
> Defense expenses, whether incurred by the Company or by the insured, shall be totaled with the amount of such judgment or settlement for the purpose of determining the liability of the Company in excess of the retained limit.

The conditions portion of this policy provides:

> No action shall lie against the company unless, as a condition precedent thereto . . . the amount of the insured's obligation to pay, in excess of the retained limit, shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

(Appellant's Br. 10; Appellee's Br. 16-17.)

to defend, then—even under a narrow reading of the duty to indemnify—a lawsuit certainly would not be required to trigger the duty to indemnify.

But although the potential construction of Wausau's duty to defend under the excess umbrella policies provides interpretative support for the conclusion that a lawsuit is also not required to trigger its duty to indemnify, the duty to defend is not directly before us. The claims in this case center on Wausau's duty to indemnify. Because a duty to indemnify separate from and independent of a duty to defend is cognizable under Illinois law and because both Keystone's general liability and excess umbrella policies suggest that Wausau's duty to indemnify is in fact based on different conditions from its duty to defend, the district court erred in granting summary judgment to Wausau on the grounds that a lawsuit was necessary to trigger the duty to indemnify.

Yet that does not end our inquiry. Although the duty to indemnify and the duty to defend are separate and independent in Keystone's policies, those policies require that Keystone be *legally obligated* to pay damages before Wausau's duty to indemnify attaches. Understanding *CILCO* is therefore critical to understanding the indemnification terms of the Keystone policies. The *CILCO* policies, like those at issue here, also hinged indemnification on the insured's "legal obligation" to pay damages. But *CILCO* specifically held that a *statutory* obligation standing alone was insufficient to trigger the duty to indemnify. *Id.* at 224-25. In so holding, the Illinois Supreme Court concluded that "[a]t a minimum, the insured must be acting in response to a claim." *Id.* at 225. That claim, however, "need not necessarily be in the form of a demand letter, particularly when the legal obligation being asserted is based on a strict liability statute." *Id.* Thus, although a lawsuit is not always required to trigger an insurer's duty to indemnify, here (as in *CILCO*) the policies require that some claim or articu-

lated demand assert a legal obligation on the part of Keystone to remediate the environmental contamination.

The key question with regard to each of the four sites, then, is whether Keystone undertook its cleanup measures gratuitously or in response to a demand or coercive or intimidating suggestion by an enforcement agency. *See id.* at 225 (concluding that CILCO was operating under a legal obligation when it agreed to participate in a voluntary cleanup program because the IEPA suggested that it could do the necessary cleanup "the easy way or the hard way"). No lawsuit was filed in connection with the Impex Site, the Chicago Steel & Wire Site or the Ninth Avenue Site. Keystone admits that it discovered contamination at the Impex Site and the Chicago Steel & Wire Site on its own initiative. Keystone also admits that it enrolled these sites in voluntary remediation programs. But the district court did not consider whether coercive suggestions caused Keystone to undertake this remedial action. Although *CILCO* precludes the argument that mere statutory liability is sufficient to trigger an insured's legal obligation to remediate, this requirement does not eliminate the circumstance of demands or coercive suggestions made by enforcement agencies.

Likewise, although there was no formal lawsuit against Keystone relating to the Ninth Avenue Site, the record indicates that Keystone undertook remedial action there *only* after the U.S. EPA ordered it to investigate and remediate. Since *CILCO* contemplates the possibility that such pressure may be sufficient to constitute a "claim" and to impose a sufficiently focused legal obligation on Keystone, the lack of a formal lawsuit does not seem to preclude indemnification under the policies. *Id.* at 225-26.

Finally, Keystone contends that it undertook remedial action at the Peoria Site only in response to pressure from the IEPA, including the 1993 complaint alleging that

Keystone failed to meet its obligations under the 1988 consent decree. The district court concluded that the 1993 complaint did not trigger Wausau's duty to defend (and therefore its duty to indemnify) because the complaint alleged only procedural violations on the part of Keystone. But this analysis does not consider whether Keystone acted voluntarily or in response to coercive invocation of its obligation to remediate. In addition, the district court's statement is incorrect insofar as its rests on the belief that a lawsuit is necessary under Illinois law to trigger an insurer's duty to indemnify.

Thus, because the district court erroneously concluded that Wausau's duty to indemnify depended on its duty to defend, it never reached the key issue whether Keystone undertook its remedial action voluntarily. The court's incorrect interpretation of Illinois law is enough to justify reversal.

### III.  Conclusion

In sum, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

A true Copy:

       Teste:

                 _____

                 *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*