In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-1665

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

KACI CLAYTON, Special Administrator of the Estate of Kenzi
Alyse Schuler,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cv-03138 — **Sue E. Myerscough**, *Judge.*

———————————

ARGUED FEBRUARY 9, 2022 — DECIDED MAY 6, 2022

———————————

Before FLAUM, BRENNAN, and ST. EVE, *Circuit Judges.*

FLAUM, *Circuit Judge.* This appeal presents questions of Il-
linois contract interpretation. Defendant-appellant Kaci Clay-
ton, on behalf of the estate of her deceased infant daughter
Kenzi Alyse Schuler, appeals from the district court's grant of
summary judgment for plaintiff-appellee Liberty Mutual Fire
Insurance Company ("Liberty Mutual") on its request for a
declaratory judgment that the company does not have a duty

to defend or indemnify Kellie Glick—the individual in charge of Schuler at the time of her death—in the underlying wrongful death lawsuit. For the following reasons, we affirm the district court's grant of summary judgment.

## I.   Background

### A.  Factual Background

A tragic incident gave rise to this suit. Glick, without a written or formal agreement, provided childcare for Clayton's infant daughter, Kenzi Alyse Schuler. Glick received $25 per day when she provided home daycare services and was paid in cash at the end of the week for the days that she cared for the child. On January 29, 2018, infant Schuler died while in Glick's care. The Sangamon County Coroner's Office Report indicated that the infant's death resulted from bedding asphyxia after being placed prone on a couch cushion covered with a blanket to nap.

On the date of the incident, Lance and Kellie Glick held an active insurance policy issued by Liberty Mutual. The relevant insurance policy, identified as policy number H32-248-910969-00, was effective from December 25, 2017, through December 25, 2018. With respect to liability coverage outlined in Section II, the policy stated:

> COVERAGE E – Personal Liability
>
> If a claim is made or a suit is brought against an "insured" for damages because of "bodily

injury"[1] … caused by an "occurrence"[2] to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

Relevant here, the policy excludes

"bodily injury" … [a]rising out of or in connection with a "business"[3] engaged in by an "insured." This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business."

---

[1] The policy defines "bodily injury" as "bodily harm, sickness or disease, including required care, loss of services and death that results."

[2] The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in … '[b]odily injury' … or '[p]roperty damage.'"

[3] The policy defines "business" as "includ[ing] trade, profession or occupation."

A separate endorsement states, "<u>NO</u> SECTION II – LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS" and "<u>LIMITED</u> SECTION I – PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS." More specifically,

> If an "insured" regularly provides home day care services to a person or persons other than "insureds" and receives monetary or other compensation for such services, that enterprise is a "business." Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an "insured" to a relative of an "insured" is not considered a "business."

> Therefore, with respect to a home day care enterprise which is considered to be a "business," this policy … [d]oes not provide Section II – Liability Coverages because a "business" of an "insured" is excluded under exclusion 1.b. of Section II – Exclusions[.]

Notably, this day care endorsement states "THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE."

### B. Procedural Background

On February 14, 2018, with respect to the insurance claim asserted by the Estate of Kenzi Schuler against Glick, a Liberty Mutual claim resolution specialist wrote:

> In this particular case, I secured a recorded statement from you [Glick] on February 7, 2018. During our discussion, you confirmed that you

> were operating a home daycare out of your home. You have indicated that you have been operating this daycare out of your home for approximately 13 years. Over the years, you have watched many children. On the date of the incident, you advised that you were caring for [three other children] and Kenzi Schuler. None of the aforementioned children are your relatives. Furthermore, you've indicated that in exchange for your services you receive compensation in the form of cash and/or checks. Many of these children are watched daily and the approximate rate of your services is $25/day per child. Lastly, you've indicated that you did not inform Liberty Mutual of your daycare business. In light of this, the exclusions may preclude coverage.

The letter concluded by directing Glick to immediately provide Liberty Mutual with a copy of any lawsuit pertaining to this claim, should she receive one, and noted the company "certainly sympathize[s] with this unfortunate situation."

A follow-up letter from Liberty Mutual dated October 23, 2018, stated that Glick should "be advised that, on the basis of the information provided to us to date and our investigation, it appears that [Liberty Mutual] ha[s] no duty to indemnify [Glick] and therefore, [Liberty Mutual] do[es] not anticipate paying or reimbursing [Glick] for any payment or settlement in connection with any claim."

On March 8, 2019, Clayton—as special administrator of the estate of her deceased daughter—filed a wrongful death lawsuit in the Circuit Court of Montgomery County, Illinois,

Case No. 2019L4, seeking damages from Glick for her alleged negligence in caring for Schuler on the date of her death.

On May 28, 2019, Liberty Mutual filed this action for judgment declaring that an insurance policy they issued to Glick provides no coverage for the wrongful death lawsuit filed by Clayton on behalf of her deceased daughter. On August 27, 2020, Liberty Mutual filed a motion for summary judgment. Clayton opposed the motion, and Glick did not respond. The district court granted Liberty Mutual's motion for summary judgment and expressly declared Liberty Mutual has no duty to defend or indemnify Glick in the underlying lawsuit. Clayton now appeals.

## II.    Discussion

"We review de novo a district court's interpretation of an insurance policy and its decision to grant summary judgment." *Atlantic Cas. Ins. Co. v. Garcia*, 878 F.3d 566, 569 (7th Cir. 2017) (emphasis omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although we construe the facts in the light most favorable to the non-moving party, *Berg v. New York Life Ins. Co.*, 831 F.3d 426, 428 (7th Cir. 2016)—here, Clayton—we need only draw "reasonable" inferences from the record, *see Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989).

Both parties agree Illinois law controls. "Illinois law recognizes that the insurer's duty to defend arises when 'the facts

alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions.'" *Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 951–52 (7th Cir. 2020) (quoting *Crum & Forster Managers Corp. v. Resol. Tr. Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993)). "The duty to defend is *generally* broader because it arises in cases of arguable or potential coverage," while the duty to indemnify "arises only in circumstances of *actual* coverage; if the insurance policy does not cover what is alleged in the claim, the insurer will not have a duty to indemnify based on that claim." *Keystone Consol. Indus., Inc. v. Emps. Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006) (citing *Crum & Forster*, 620 N.E.2d at 1081).

Our inquiry thus centers on whether a genuine issue of material fact exists as to whether the facts alleged in the underlying suit potentially fell within the policy's coverage. "Our primary goal in interpreting an insurance policy 'is to give effect to the intent of the parties as expressed in the agreement.'" *Berg*, 831 F.3d at 428 (quoting *DeSaga v. W. Bend Mut. Ins. Co.*, 910 N.E.2d 159, 163 (Ill. App. Ct. 2009)). "Where the terms of an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning and enforced as written, unless to do so would violate public policy." *Id.* at 429 (citation and internal quotation marks omitted). The coverage document is reviewed holistically; "[t]he policy and endorsements of an insurance policy must be construed together to determine the meaning and effect of the insurance contract." *Strowmatt v. Sentry Ins.*, 175 N.E.3d 204, 212 (Ill. App. Ct. 2020). "Where the policy and the endorsements conflict, the endorsement prevails, at least where it is clear that the policyholder understood and accepted the language of the endorsement." *Id.*

On appeal, we look to the applicability of the home day-care business exclusion. In reaching a conclusion about applicability, we first review the scope of coverage as defined by the text of the insurance policy itself and next consider the relevance of the two-part test laid out in *Allstate Insurance Co. v. Mathis*, 706 N.E.2d 893 (Ill. App. Ct. 1999).

### A.  Scope of Coverage

The first issue is whether the business exclusion, as further explained in the daycare endorsement, precludes coverage in this case. We begin by looking to "what is required to trigger an insurer's dut[ies]" under the relevant insurance policy. *Keystone*, 456 F.3d at 762.

Looking first to the terms of the insurance policy in question, "[i]f a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury,'" Liberty Mutual will "[p]ay up to [the] limit of liability for the damages" and "[p]rovide a defense at [their] expense by counsel of [their] choice." As an explicit exclusion, bodily injury "arising out of or in connection with a 'business' engaged in" by the insured is not covered. More specifically, the "regular[]" provision of home day care services and the receipt of "monetary or other compensation for such services" qualifies as a business.

Returning to the general rule of thumb in contracts, the "primary goal" when interpreting any insurance policy is to give effect to the parties' intent, as expressed in their agreement. *Berg*, 831 F.3d at 428. When "the terms of an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning and enforced as written, unless to do so would violate public policy." *Id.* at 429.

Clayton asserts genuine issues of material fact preclude summary judgment due to ambiguity in the policy terms. We, however, agree with the district court's position that the relevant policy terms are unambiguous in their meaning and present application—a conclusion supported by the language of the insurance policy itself.

In reaching our conclusion about ambiguity in the business pursuits exception, defining "regular" and "compensation" proves critical. First, "regular" is defined as "constituted, conducted, scheduled, or done in conformity with established or prescribed usages, rules or discipline" or "recurring, attending, or functioning at fixed, uniform, or normal intervals." *Regular*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com (last visited May 2, 2022). The record supports the conclusion that the care services provided by Glick to infant Schuler were "regular"; there appears to be no genuine issue of material fact on that point. Clayton, in her answers to Liberty Mutual's first set of interrogatories, stated that Glick provided care to infant Schuler on the days the parents worked. In a handwritten response to Liberty Mutual's first set of interrogatories, Glick stated that "I believe I watched Kenzie [*sic*] from about 7:30 a.m. – 5:30 p.m. M-F unless other arrangements were made with other family members. I do not remember what I charged Kaci [and] Kris." Clayton argues that while forty hours of care per week provided over the course of ten months amounts to "regular" provision of care, *see Mathis*, 706 N.E.2d at 1028, the seven weeks Schuler was cared for falls short of that standard. We disagree.

The January 2018 Illinois State Police Investigative Report touched on regularity of care. The report stated:

> Kellie Glick had been [infant's] only babysitter.
> Glick babysat [infant] about four days a week
> from 7:25 a.m. to 5:30 p.m. at a rate of $25 per
> day. In the last couple of weeks Glick only
> babysat [infant] a few times because of [infant's]
> doctor visits and a death in the family.

Although during the final two weeks of Schuler's life she was watched with less frequency, this still does not amount to a wholesale disruption of the established pattern of care—Glick watched Schuler on the days her parents worked, unless arrangements were made with other family members. We hold "regularly" is an unambiguous term. As applied to these facts, the district court did not err in finding no genuine issue of material fact existed on the "regularity" issue.

To fall within the confines of the home day care services endorsement, the provision of services must be both "regular" and involve the receipt of "compensation," whether that be monetary or otherwise. Thus, we turn next to the definition of "compensation"—a definition hotly contested by the parties. Black's Law Dictionary defines "compensation" as "[r]emuneration and other benefits received in return for services rendered; esp., salary or wages." *Compensation*, Black's Law Dictionary (11th ed. 2019).

The primary point of contention here is whether "compensation" encompasses "reimbursement." Clayton argues it does not. In her view, the district court erred in its reliance on a Florida case holding that "even payment as reimbursement for expenses in a home day care constitutes compensation for purposes of the home day care endorsement." *See First Protective Ins. Co. v. Featherston*, 906 So. 2d 1242 (Fla. Dist. Ct. App. 2005). We decline to adopt Clayton's proposed framing. In the

absence of controlling precedent, the district court may look to out of circuit precedent as persuasive authority. *See Est. of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) (noting that "[i]n the absence of controlling precedent" courts "broaden [their] survey to include all relevant case law"). What's more, the district court simply used the logic of the Florida state court to bolster its commonsense approach. As the district court pointed out, ambiguity requires reasonable susceptibility to multiple interpretations; it does not necessarily arise from the parties' "suggest[ion] [of] creative possibilities for their meaning." *BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 819 (7th Cir. 2008). Arguing that the exchange of cash for babysitting services amounted to a transaction distinct from remuneration in return for services rendered is simply a creative possibility conjured by Clayton that we need not credit as establishing ambiguity. Glick's handwritten interrogatory responses indicated she charged "fees" calculated according to parental "financial circumstances" in exchange for watching the children under her care. As applied to these facts, we hold the district court did not err in finding that no genuine issue of material fact existed on the "compensation" issue.[4]

---

[4] In its motion for summary judgment before the district court, and again on appeal, Liberty Mutual relies on Glick's deemed admission that "she provided home day care services for Kenzi Schuler in exchange for 'cash compensation' of $25.00 per day." Clayton—apparently for the first time in her appellate reply brief—challenges Liberty Mutual's reliance on the Rule 36(b) admissions of Glick, a *pro se* litigant. Clayton argues that "Glick's admissions cannot and should not be used as ammunition against Clayton to avoid coverage for an incident that resulted in the death of Clayton's infant child." Looking to Clayton's opening appellate brief, she acknowledges the potential role of judicial admissions when she states that "[w]hile Clayton admits she would have provided $25.00 a day to Defendant Glick, and because of Glick's failure to respond to the Request

Based on this analysis, we hold these regular and compensated home day care services qualify as a business under the relevant policy endorsement. By the language of the business exclusion, coverage is precluded for bodily injury "arising out of or in connection with a 'business' engaged in" by the insured. Thus, the only remaining question is whether the injury in question "ar[ose] out of" or was "in connection" with the defined home day care business. This question needs little analysis. As the Illinois intermediate court previously explained:

> Although the term "arising out of" should be given a limited interpretation in favor of the insured, it is clear the unfortunate circumstances that caused [the deceased child's] death arose out of [the babysitter's] duty to provide day care services to the [deceased child's family]. By offering to baby-sit the children, [the babysitter] undertook a duty to protect and supervise them as well. In their complaint, the [deceased child's family] alleged that she failed to complete these duties—obligations directly correlated to providing day care services. Accordingly, we find that [the deceased child's] injuries arose out

---

to Admit there is an 'admission' of receipt of 'compensation', 'compensation' is undefined by the policy." Even setting aside the fact that Clayton may have waived her challenge to the Rule 36(b) deemed admissions, *see United States v. Desotell*, 929 F.3d 821, 826 (7th Cir. 2019) ("In most instances, litigants waive any arguments they make for the first time in a reply brief."), we need not wade into this issue. We see no genuine issue as to material fact, even considering only the handwritten responses provided by Glick rather than any deemed admission stemming from a failure to respond.

> of [the babysitter's] business activity and thus,
> regrettably, are not covered by the policy.

*Mathis*, 706 N.E.2d at 1030 (citation omitted) (ruling that where the insured babysat an infant for compensation and the child accidentally suffocated while under their care, the child's death arose out of a duty "directly correlated to providing day care services"). Adopting this reasoning, Glick offered to babysit Schuler, and in so doing, undertook a duty to protect and supervise the child. The underlying lawsuit alleges Glick failed to complete these duties, duties which directly correlate to the provision of day care services (*e.g.*, safe nap practices). Just as the court found in *Mathis*, we, too, hold this business activity is not covered by Glick's policy. In our view, the district court, after careful consideration of the record, came to the only reasonable conclusion: Glick's homeowner's insurance policy did not cover her childcare business endeavor. In short, the district court did not err in finding no genuine issue of material fact existed.

### B. Relevance of the *Mathis* Test

The last issue to resolve on appeal is whether the district court erred in relying on the unambiguous meaning of the relevant terms, rather than applying the two-part test outlined in *Mathis*. "In determining whether a business pursuit exclusion applies to a particular set of facts, courts in Illinois have typically applied a two part test: (1) is the activity regular and continuous? and (2) does the activity provide at least some portion of the insured's livelihood?" *Mathis*, 706 N.E.2d at 894.

In arguing that Liberty Mutual fell short of establishing what is required to trigger a business pursuit exclusion under Illinois law, Clayton fails to acknowledge that the written

policy controls. The written policy requires a showing of regular provision of daycare services (rather than regular and continuous) and a showing of monetary or other compensation (rather than proof of some portion of the insured's livelihood).

Under Illinois law, "[i]n construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement." *Crum & Forster*, 620 N.E.2d at 1078. The parties' intentions, as unambiguously expressed in writing, control here. We need not, and should not, override the express written intent of the parties by looking to a judicially created test. Thus, we agree with the district court's position that the *Mathis* two-part test for determining whether a business pursuits exclusion eliminates coverage does not apply to the different policy language at issue here.

### III.    Conclusion

Glick's Liberty Mutual insurance policy did not cover the daycare operation in question. Since Clayton's claim "did not even *potentially* fall within the scope of coverage for purposes of the duty to defend, it logically follow[s] that the claim would not *actually* fall within the scope of coverage for purposes of the duty to indemnify." *Sokol & Co.*, 430 F.3d at 421. Therefore, the terms of the insurance policy, as a matter of law, did not obligate Liberty Mutual to defend or indemnify Glick. For these reasons, we AFFIRM the district court's entry of summary judgment.