KEYSTONE CONSOLIDATED
INDUSTRIES, INC. and
Valhi, Inc., Plaintiffs,

v.

EMPLOYERS INSURANCE, COMPANY OF WAUSAU (f/k/a Employers Mutual Liability Company of Wisconsin), Defendants.

No. 03–1201.

United States District Court,
C.D. Illinois.

Jan. 24, 2007.

Andrew Running, Kirkland & Ellis, Chicago, IL, for Plaintiffs Keystone Consolidated Industries, Inc. and Valhi, Inc.

Bryan Barber, Barber Law Group, San Francisco, CA, for Defendant Employers Insurance Company of Wausau (f/k/a Employers Mutual Liability Company of Wisconsin).

## *ORDER*

MIHM, District Judge.

Now before the Court are three Motions for Summary Judgment. For the reasons set forth below, Defendant Employers Insurance, Company of Wausau's ("Wausau") Motion for Summary Judgment on the issue of "no suit" [# 72] is DENIED; Wausau's Motion on the issue of late notice [# 38] is DENIED; Wausau's Motion on the pollution exclusion [# 70] is GRANTED IN PART and DENIED IN PART.

---

1. In 1984, Keystone spun off a portion of its business and facilities, some of which are at issue in this case, to a company that is now known as Valhi, Inc. For the sake of simplicity, the Court will simply refer to the Plaintiffs collectively as "Keystone."

## BACKGROUND

A full statement of this case, including a history of the relationship between the parties, has already been set out in the District Court's Order of August 1, 2005, [# 35] and the Opinion of the Seventh Circuit Court of Appeals reversing that Order, *Keystone Consolidated Industries, Inc., v. Employers Insurance Company of Wausau,* 456 F.3d 758 (7th Cir. August 3, 2006).

A summary of the relevant proceedings up to this point is as follows: Keystone[1] brought this action against its insurer, Wausau, seeking indemnification for losses it suffered because of environmental contamination at seven of its sites. The parties entered into a settlement agreement regarding three of the sites, leaving the Peoria, Ninth Avenue, Impex, and Chicago Steel & Wire ("CS & W") sites the active subjects of this litigation.

In March of 2005, Wausau filed four Motions for Summary Judgment, arguing that it was entitled to judgment as a matter of law on four separate grounds. On August 1, 2005, this Court entered an Order granting Wausau's Motion for Summary Judgment on the "No Suit" issue. This ruling made the other three pending motions moot. However, the Seventh Circuit reversed this Court on the "no suit" issue and remanded the case to this Court with new instruction.[2]

Upon receipt of the Seventh Circuit's mandate, this Court invited supplemental pleading on the "No Suit" issue, in light of the Seventh Circuit's opinion, and the parties have submitted such pleadings. In addition, the three alternate Motions for

---

2. The details of the Seventh Circuit's opinion and instruction to this Court will be laid out below.

Summary Judgment have been "unmooted" and revived for consideration by this Court. On November 21, 2006, the parties submitted and the Court entered a Joint Stipulated Order resolving the issue of after-acquired and after-involved liabilities, leaving before the Court Motions for Summary judgment on three issues: "No Suit," Late Notice, and the Absence of an Accident or Occurrence/Pollution Exclusion. The Court will separately set out the policy provisions and factual background relevant to those issues below. On Nov. 21, 2006, the Court heard oral argument from the parties at a telephonic status conference. All matters are fully briefed, and this Order follows.

## DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment should be granted where the pleadings and other admissible evidence show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(C). The moving party has the responsibility of informing the court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing that there are no disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. In other words, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

### B. Motion for Summary Judgment Based on "No Suit"

In its initial Motion on the "No Suit" issue, Wausau had argued that it was not liable to indemnify Keystone under the CGL policies because Illinois courts require the filing of a formal complaint in a court of law to trigger the "duty to defend" clause of a comprehensive general liability insurance contract, and where there is no duty to defend, there will be no duty to indemnify. After reviewing Illinois precedent and the facts of the instant case, the Court agreed with Wausau and concluded that (1) under Illinois law, where there was no duty to defend, there was no duty to indemnify, and (2) the duty to defend was not triggered with respect to any of these four Keystone sites, and therefore, Wausau had no duty to indemnify.

The Seventh Circuit reversed on step (1), and remanded for reconsideration of step (2). Specifically, the Seventh Circuit found that the duties to defend and to indemnify were not coextensive, stating,

> In many circumstances, the duty to indemnify explicitly involves the duty to defend a lawsuit or its functional equivalent. In other cases, however, the duty to indemnify is separate from and independent of the duty to defend. In short, while a lawsuit may be sufficient to trigger an insurer's duty to indemnify, it is not a necessary condition under Illinois law.

456 F.3d 758, 762 (7th Cir.2006). The Seventh Circuit then looked to the Wausau policies issued to Keystone, found that the two duties were in fact separate in this case, and that under the language of the policies, Keystone must be *legally obligated* to pay damages before Wausau's duty to indemnify would attach. The Seventh Circuit then looked to the Illinois case of *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill.2d 141, 290 Ill.Dec. 155, 821 N.E.2d 206 (2004), because "[t]he CILCO policies, like those at issue here, also hinged indemnification on the insured's 'legal obligation' to pay damages." *Id.* At 765. The proper inquiry, the Seventh Circuit held, was whether Keystone's remediation efforts for which it seeks coverage were "voluntary":

> The key question with regard to each of the four sites, then, is whether Keystone undertook its cleanup measures gratuitously or in response to a demand or coercive or intimidating suggestion by an enforcement agency. No lawsuit was filed in connection with the Impex Site, the Chicago Steel & Wire Site or the Ninth Avenue Site. Keystone admits that it discovered contamination at the Impex Site and the Chicago Steel & Wire on its own initiative. Keystone also admits that it enrolled these sites in voluntary remediation programs. But

the district court did not consider whether coercive suggestions caused Keystone to undertake this remedial action. Although *CILCO* precludes the argument that mere statutory liability is sufficient to trigger an insured's legal obligation to remediate, this requirement does not eliminate the circumstance of demands or coercive suggestions made by enforcement agencies.

*Id.* at 766, 290 Ill.Dec. 155, 821 N.E.2d 206.

In its Supplemental Memorandum on Remand Regarding the Voluntariness of Keystone's Site Cleanups, Wausau conceded that not all of Keystone's clean-up activities at the Peoria and Ninth Avenue sites were "entirely voluntary." Therefore, Wausau withdrew its Motion for Summary Judgment with respect to those sites, but maintained that it was entitled to judgment as a matter of law with respect to the Impex and CS & W sites.

Wausau argues that Keystone has literally admitted that the remediation it conducted Impex and CS & W was voluntary.

**1. Chicago Steel & Wire**

■ Wausau cites Keystone's responses to three different interrogatories from the discovery phase of this litigation. Interrogatory No. 5 asked:

> With respect to each Purported Underlying Claim brought against Keystone and/or Valhi, state separately with respect to each the date on which Keystone and/or Valhi first received Notice of such Purported Claim, the identity of the Keystone and/or Valhi representative who first received such Notice, and that person's current address and telephone number.

Keystone responded:

> Chicago Steel & Wire Site: During a 2000 site investigation *to facilitate the sale of the facility*, Valhi discovered

VOC and lead contamination in soil and groundwater, its first notice of a potential claim at this Site. Subsequent investigation of the potential claim ensued. Valhi notified the Illinois EPA of its findings and enrolled the Site in the State's *pre-notice environmental remediation program.* After conducting further investigations and developing a risk-based corrective action plan, Valhi received IEPA approval in August 2002 for its remediation program. The IEPA issued a "no further action" letter approving of the remediation in December, 2002. Valhi incurred a total cost for this investigation and remediation project of $488,710 . . .

(Emphasis added). Interrogatory No. 7 asked:

With respect to each of the Purported Underlying Claims, separately describe the occurrence(s) giving rise to Keystone and/or Valhi's claim for coverage, the time period of the occurrence, and the date you first became aware of the occurrence in connection with the Sites.

Keystone responded:

Chicago Steel & Wire Site: Industrial site operated since about 1920 that made fine and specialty wire; did galvanizing, plating, concrete pits, ammealing, USTs. The site was acquired by Keystone on 08/31/65, merged into Keystone on 06/30/68, and operated until 1986. During a 2000 site investigation to facilitate the sale of the facility, Valhi discovered VOC and lead contamination in soil and groundwater, its first notice of possible contamination at this Site. Subsequent investigation of the possible contamination ensued. Valhi notified the Illinois EPA of its findings and *enrolled the Site in the State's pre-notice environmental remediation program.* After conducting further investigations and developing a risk-based corrective action plan, Valhi received IEPA approval in August 2002

for its remediation program. The IEPA issued a "no further action" letter approving of the remediation in December, 2002. Valhi incurred a total cost for this investigation and remediation project of $488,710.

(Emphasis added). Interrogatory No. 9 asked:

Identify every local state or federal judicial, administrative, or legislative proceeding, formal or informal, concerning Keystone and/or Valhi which has been held or is scheduled to be held in connection with any of the Purported Underlying Claims or any of the Sites of which Keystone and/or Valhi has knowledge.

Keystone's response to this interrogatory made no mention of any proceedings affecting the CS & W site. In addition to these interrogatory responses, Wausau also points to a letter from Keystone's environmental consultant to the Chicago Department of Environment concerning the CS & W site, describing Keystone's actions as "voluntary."

The bulk of Keystone's Supplemental Memorandum on Remand is devoted to the "nonvolutariness" of its actions at the Peoria and Ninth Avenue sites. In its brief section addressing the CS & W site, Keystone makes no reference to any sale of the CS & W site. Keystone states that it was issued an IEPA Notice of Violation ("NOV") in 1997. It goes on to state, "[t]hat unresolved IEPA notice of violation was cited by Valhi's consultant in its March 6, 2000 Phase I Environmental Site Assessment, which led to Valhi's enrollment of the Chicago Steel & Wire site in the IEPA cleanup program." Pl.'s Supp. Mem. on Remand, at 11. In its pleadings, Keystone only submitted the Site Assessment Report that references the 1997 IEPA NOV, and not the actual NOV itself.

The Court held a status conference on November 21, 2006, during which counsel for Keystone stated that it would attempt to obtain copies of the actual notices of violation in order to facilitate the Court's resolution of the "No Suit" Motion for Summary Judgment. On December 19, 2006, Keystone made a supplemental submission. With respect to the CS & W site, Keystone has submitted a copy of the 1997 NOV from the IEPA along with other internal IEPA paperwork concerning the CS & W site investigation. The NOV provides a list of violations and includes the following statement: "Due to the nature and seriousness of the violations cited, please be advised that resolution of the violations may require the involvement of a prosecutorial authority for purposes that may include, among others, the imposition of statutory penalties."

The NOV informs CS & W that a written response "must be submitted" within 45 days of receipt, addressing what CS & W plans to do to correct the violations and the time frame in which it intends to complete those efforts. This written response "will constitute a proposed Compliance Commitment Agreement" under IEPA Act, and will be accepted or rejected by the IEPA within 30 days of receipt. In its closing, the IEPA again mentions the possibility of prosecutorial involvement: "If a timely written response to the Violation Notice is not provided, it shall be considered to be a waiver of the opportunity to respond and to meet and the Illinois EPA may proceed with a referral to the prosecutorial authority."

Before the Court can grant its Motion for Summary Judgment on this issue, Wausau must convince the Court that Keystone cannot establish that its remediation efforts were taken "in response to a demand" or coercion by environmental agencies. *Keystone*, 456 F.3d at 766. It is clear that, under the Seventh Circuit's opinion and the Illinois case on which the Seventh Circuit principally relies, *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill.2d 141, 290 Ill.Dec. 155, 821 N.E.2d 206 (2004), the 1997 IEPA NOV is sufficiently threatening or coercive. In *CILCO*, the Illinois Supreme Court made clear that the mere existence of a statutory obligation, alone, is insufficient to invoke an insurer's duty to indemnify; there must be some "claim," and not just gratuitous compliance. *Id.* at 225. While the claim "need not necessarily be in the form of a demand letter," a demand letter would certainly be sufficiently coercive to trigger the insurer's indemnity obligations. *See id.* A "demand letter" is a "letter by which one party explains its legal positions in a dispute and requests that the recipient take some action or else risk being sued." *Id.* (quoting *Black's Law Dictionary* 463 (8th ed.2004)). Here, the ultimatum in the 1997 IEPA NOV is crystal clear—start cleaning up or else risk being prosecuted.

However, our analysis does not end here. The mere existence of a claim or "coercive suggestion" is not enough. In order to be entitled to indemnity under the policies, Keystone must have remediated *in response to* the NOV. *Keystone*, 456 F.3d at 766. This precise inquiry of "whether Keystone undertook its cleanup measures gratuitously or in response to a demand or coercive or intimidating suggestion," *id.*, demands a consideration of motive, along with the tangential concerns of mixed motive or pretext.

Here, Wausau has put forward evidence—Keystone's own interrogatory responses and correspondence—that its actions at CS & W were voluntary, that it was remediating the contamination at Impex because it wanted to sell the property, without even any mention of citation by the environmental authorities. However, self-enrolling in environmental clean-up

programs or labeling one's remediation efforts as "voluntary" does not necessarily compel a finding that remediation efforts were "gratuitous," for purposes of determining whether or not indemnity is required. In the circumstances of this case, for example, the IEPA NOV presented two options: (a) "voluntarily" correct your violations on your own terms, or (b) be sued and correct them on *our* terms. To choose option (a) is not truly voluntary; it is not "a purely unilateral effort." *Id.* at 224.

Still, Keystone's own answers to the above interrogatories make no mention of any demands or suggestions by the environmental authorities. Moreover, at the November 21 oral argument, Keystone admitted that the IEPA never took action on the NOV, and that more than two years passed between the time Keystone received the NOV and it began clean-up efforts. This also raises doubts about Keystone's actual motives.

In conclusion, because there is competing credible evidence regarding whether Keystone can establish that its remediation efforts at CS & W were made in response to coercion by environmental authorities, summary judgment on this point is not appropriate.

### 2. The Impex Site[3]

The parties' arguments with respect to the Impex site are similar to those addressing CS & W. Wausau again cites Keystone's responses to interrogatories 5, 7, and 9.

In response to Interrogatory 5 (see above), Keystone responded:

Impex site: *In preparation for a proposed sale of the facility,* Valhi arranged for an environmental assessment of the former Impex facility, which was completed in 1990. That assessment identified VOC contamination of the soil and groundwater, its first notice of a potential claim at this Site. Subsequent investigation of the potential claim ensued. Valhi submitted a *voluntary cleanup plan* to the Indiana Department of Environmental Management in August 1991. Pursuant to that plan, Valhi completed the installation and began operation of a VOC soil vapor extraction system and a groundwater pump and treat system at the former Impex site in January 1992. Valhi has incurred investigation and cleanup costs in excess of $1,161,000. In addition, Valhi has funded a $1 million escrow account for future groundwater cleanup work, and expects to incur additional investigation and remedial costs beyond the amount of that escrow account to address recently discovered TCE contamination.

(Emphasis added). In response to Interrogatory 7, Keystone responded:

Impex site: constructed in the mid–1950s, and acquired by National Lock Company, a subsidiary of Keystone, on July 1, 1964, the facility was a metal-working plant that produced cold headed products, including electrical and automotive parts from copper, aluminum and steel. Operations at the plant included metal forming, cleaning, machining, degreasing, finishing, and electroplating. *In preparation for a proposed sale of the facility, Valhi arranged for an environmental assessment of the former Impex*

---

**3.** In its Memorandum in Support of its Motion for Summary Judgment on the Pollution Exclusion and the Absence of an Accident or Occurrence, Wausau argues that under Illinois choice-of-law rules, Illinois law applies to all of the Wausau policies issued to Key-

stone that are subjects of this litigation, even as those policies apply to the Impex facility, which located in Indiana. Keystone does not dispute that Illinois should apply with respect to all of the sites.

*facility,* which was completed in 1990. That assessment identified VOC contamination of the soil and groundwater, its first notice of possible contamination at this Site. Subsequent investigation of possible contamination ensued. Valhi submitted a *voluntary cleanup plan* to the Indiana Department of Environmental Management in August 1991. Pursuant to that plan, Valhi completed the installation and began operation of a VOC soil vapor extraction system and a groundwater pump and treat system at the former Impex site in January 1992. Valhi has incurred investigation and cleanup costs in excess of $1,161,000. In addition, Valhi has funded a $1 million escrow account for future groundwater cleanup work, and expects to incur additional investigation and remedial costs beyond the amount of that escrow account to address recently discovered TCE contamination.

As with CS & W, Keystone's response to Interrogatory 9 made no mention of any proceedings affecting the Impex site. In addition to these interrogatory responses, Wausau points to other Keystone documents—a letter from Keystone's attorney to the Indiana Department of Environmental Management ("IDEM") and an internal Keystone memo—which refer to the Impex cleanup as voluntary.

In the rather brief section of Keystone's Supplemental Memorandum on Remand devoted to the "nonvolutariness" of its actions at the Impex site, Keystone does not address the sale of that site. Keystone states that it was cited for Resource Conservation and Recovery Act ("RCRA") violations in 1983, that the U.S. EPA and the IDEM required Impex to obtain closure of the Impex site, and that in April 1991 the IDEM informed Impex that a February 1991 site inspection had identified "on-site waste deposits, soil discoloration, and evidence of spills and runoff that required a

hazardous waste determination." Keystone states that it responded to this notice in May 1991 by committing to enroll the site in the state cleanup program.

In its Supplemental Memorandum on Remand, Keystone cites the deposition of an Impex environmental analyst who testifies of the existence of the federal and state citations, rather than attach the actual notices. In its December 19, 2006, supplemental submission, Keystone states that despite its efforts, it has not been able to obtain any records from IDEM pertaining to the Impex site, but did attach the April 1991 letter from the IDEM that was submitted with Keystone's initial Response to Wausau's Motion for Summary Judgment on "No Suit." In its supplemental submission, Keystone also represents that it is "unable to state at this point if or when [it] will be able to obtain the 1983 RCRA violation notice."

The IDEM letter regarding Impex informs Keystone that a site inspection revealed certain potentially hazardous wastes. The IDEM requests that Keystone determine whether the identified wastes are in fact hazardous and inform the IDEM in writing within 30 days. If Keystone determines that any of the listed wastes are in fact hazardous, the IDEM states that "your company will be evaluated with respect to compliance with [the Indiana Code]. You will be advised in writing of any violations and corrective action which must be taken." Unlike the IEPA NOV regarding CS & W, the IDEM Notice does not threaten prosecution if Keystone does not take the requested action. Instead, the IDEM informs Keystone that its "cooperation and efforts are appreciated."

While the IDEM's letter regarding Impex is certainly more "friendly" than the IEPA NOV regarding CS & W, "a claim need not necessarily be in the form of a

demand letter," nor a lawsuit or administrative proceeding. *CILCO*, 290 Ill.Dec. 155, 821 N.E.2d at 225. Alone, Keystone's statutory obligation to clean up would not be enough to trigger Wausau's obligation to indemnify. But here, the IDEM clearly states that if Keystone determines that the listed wastes are hazardous, corrective action "must" be taken. The IDEM does not explicitly state the consequences of failing to take corrective, possibly because the letter was written at a time when it apparently was not certain, from the IDEM's perspective, that the wastes were in fact hazardous. Still, the IDEM does not imply that any corrective action would be optional. It states that it "must" be taken. The Court considers this a tacit threat of state intervention.

However, the same evidentiary problems that arise with respect to CS & W also arise here with Impex. There is evidence that Keystone's remediation was gratuitous. Its own interrogatory responses imply that clean-up was commenced in order to prepare the property for sale, and there was a significant delay between the time Keystone was put on notice of its environmental issues (1983) and when it enrolled the site in the state cleanup program (1991). However, there is also the deposition testimony of Alan Bruner, an Impex environmental analyst, who describes the U.S. EPA and the IDEM as requiring Keystone to take certain clean-up actions (though it is not apparent if this happened in writing or conversations).

Again, because there is competing credible evidence regarding whether Keystone can establish that its remediation efforts at Impex were made *in response* to coercion by environmental authorities, summary judgment on this point is not appropriate.

### 3. Conclusion

Because there are factual disputes appropriate for resolution by a jury, Wausau's Motion for Summary Judgment on the "No Suit" issue is denied.

### C. Motion for Summary Judgment on Late Notice

Wausau has also moved for Summary Judgment based upon late notice in connection with four of the eight sites that were originally part of this litigation—Peoria, Impex, Ninth Avenue, and Byron. The parties have since settled their claims with respect to the Byron site, and therefore, the Court will only consider the Motion as it pertains to the three remaining sites.

Wausau argues that Keystone was late in providing it with notice of an occurrence and breached the notice condition precedent to coverage under the policies issued. Whether an insured's notice to its insurer was late, such that the insurer may deny coverage, is typically a question of fact, however, it may be properly resolved as a matter of law if the material facts are not in dispute. *Northbrook Property and Cas. Ins. Co. v. Applied Systems, Inc.* 313 Ill. App.3d 457, 246 Ill.Dec. 264, 729 N.E.2d 915, 921 (2000). As mentioned above, Wausau has argued that Illinois law applies to this issue, and Keystone has not disputed that.

■ Both the primary and excess umbrella policies in this case contain notice requirements. In general, breaching a policy's notice clause will defeat the right of the insured party to recover under the policy. *Country Mutual Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill.2d 303, 305 Ill.Dec. 533, 856 N.E.2d 338, 343 (2006) (citing *Simmon v. Iowa Mutual Casualty Co.*, 3 Ill.2d 318, 121 N.E.2d 509 (1954)). Here, the notice requirements under the primary and excess umbrella are somewhat differ-

ent, though the general purposes of notice requirements—to give the insurer time to gather evidence and to protect itself from unjustified claims—are the same under both types of policies. *See Tribune Co. v. Allstate Ins. Co.*, 306 Ill.App.3d 779, 239 Ill.Dec. 818, 715 N.E.2d 263, 272–73 (1999); *Am. States Ins. Co. v. Nat'l Cycle Inc.*, 260 Ill.App.3d 299, 197 Ill.Dec. 833, 631 N.E.2d 1292, 1300 (1994).

### 1. Notice under the Primary Policies

In summary, the notice provisions in the primary policies typically require that Keystone give to Wausau written notice of any occurrence "as soon as practicable" after Keystone's "insurance manager or other person designated by the named insured for that purpose has actual knowledge of the occurrence." The Wausau policies first included such a notice endorsement in 1969 and did so until the 1985–86 policy adopted the total pollution exclusion.

■ Under Illinois law, a policy condition requiring notice "as soon as practicable" is interpreted to mean "within a reasonable time." *Livorsi Marine*, 305 Ill. Dec. 533, 856 N.E.2d at 343. In assessing the reasonableness of the insured's notice of occurrence, Illinois courts examine several factors, including the specific language of the policy's notice provision, the insured's sophistication regarding insurance policies, the insured's awareness that an occurrence as defined under the policy has taken place, the insured's diligence in ascertaining whether policy coverage is avail-

able, and whether the insurer was prejudiced by any delay in notice. *Northbrook Property & Cas. Ins. Co.*, 313 Ill.App.3d 457, 246 Ill.Dec. 264, 729 N.E.2d 915, 921 (2000); *Am. Country Ins. Co. v. Bruhn*, 289 Ill.App.3d 241, 224 Ill.Dec. 805, 682 N.E.2d 366, 370 (1997).

■ The parties dispute whether or not Wausau must prove that it was prejudiced by any Keystone delay in notice. A recent Illinois Supreme Court decision clarified the proper role of the prejudice factor. In *Country Mutual Insurance Co. v. Livorsi Marine*, Inc., 222 Ill.2d 303, 305 Ill.Dec. 533, 856 N.E.2d 338 (2006), the insured had conceded that its notice to its insurer was unreasonably late. *Id.* at 342. The insurer also could not prove that it was prejudiced by the late notice. *Id.* The Illinois Supreme Court affirmed the holding of the Illinois Appellate Court: "Once it is determined the insured's notice was unreasonably and inexcusably late, the failure of the insurer to prove it suffered prejudice is irrelevant...." *Id.* However, the Illinois Supreme Court made quite clear that, where the reasonableness of notice is still at issue, the presence or absence of prejudice to the insurer remains a factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice.[4] *Id.* at 346.

■ Here, Wausau insists its rights were prejudiced by Keystone's late notice with respect to the three relevant sites—Peoria, Impex, and Ninth Avenue—be-

---

4. In its Memorandum of Law on this point, Wausau argued that lack of prejudice to the insurer is "not even relevant unless the insured has a good excuse for the late notice or the delay was relatively brief." Def.'s Mtn. For Summ. J. Based Upon Late Notice, at 15. While some Illinois Appellate Court opinions support this position, *see, e.g., Twin City Fire Insurance Co. v. Old World Trading Co.* 266 Ill.App.3d 1, 203 Ill.Dec. 264, 639 N.E.2d 584

(1993); *Fletcher v. Palos Community Consolidated School District No. 118*, 164 Ill.App.3d 921, 115 Ill.Dec. 838, 518 N.E.2d 363 (1987), others to do not. The Illinois Supreme Court in *Livorsi Marine* did not adopt this qualification. *See* 305 Ill.Dec. 533, 856 N.E.2d at 343–44. Therefore, the Court will not limit its consideration of a prejudice as a "reasonableness factor" to only the qualified circumstances that Defendant suggests.

cause it was denied the ability to conduct early investigations and oversee the remediation efforts. In response, Keystone argues that Wausau suffered no prejudice from any alleged delays in notice because Wausau's practice "was to refuse to indemnify policyholders for such claims exception through discounted litigation settlements." Pl.'s Resp. To Def.'s Mtn for Summ J. on Late Notice, at 27. Keystone cites the 1990 deposition of William McCormack, the head of Wausau's environmental claims department through 1995, who testified that "[Wausau] just [has] not indemnified anybody in one of these pollution cases," that it had settled some environmental claims for discount, as a means of "buying peace," but that it had "never indemnified for these uncovered losses nor does [Wausau] intend to." *Id.* (quoting McCormack Dep., at 194–96).

The Court agrees with Wausau's assertion that "a lack of prejudice is not determinative of whether the insured acted reasonably." Def.'s Reply Mem., at 16. However, it remains a piece in the "reasonableness" puzzle, and there is a factual dispute regarding whether or not Wausau suffered any prejudice. The Court is not convinced that all of the other reasonableness factors weigh so strongly in Wausau's favor that it can find, as a matter of law, that Keystone's notice was unreasonably late, even if it suffered absolutely no prejudice.

The record also presents other disputes of material fact. For example, the parties vigorously dispute who it was that was "designated" to make the decision of when to provide notice to Wausau.[5] This dispute is material, as one of the factors in assessing reasonableness of notice is the specific language of the policy, and the language of the primary policies in this case imposes a duty on Keystone to provide notice to Wausau "as soon as practicable" after the "insurance manager or other person designated by the named insured for that purpose has actual knowledge of the occurrence." While it may seem tedious to require Wausau to establish *who* was required to provide notice to Wausau and *when* he had *actual* knowledge of an occurrence, Wausau is bound by the terms of the policy it drafted[6] and is the moving party in this instance.

Marlin Henning served as Risk Manager for both Keystone and Valhi during the

---

**5.** Also, with respect to certain cites, such as Peoria, the parties dispute the actual point in time when any Keystone employee had notice of a possible occurrence under the policy.

**6.** In *Montgomery Ward and Co., Inc. v. Home Insurance Co.*, 324 Ill.App.3d 441, 257 Ill.Dec. 373, 753 N.E.2d 999 (2001), the Illinois Court upheld the argument that, under an insurance policy with a very similar notice provision, there was a meaningful difference between when the insured's law department knew of an occurrence and when the insurance department knew of the occurrence. The language in the policy concerning notice provided:

> Upon the happening of an occurrence or accident that appears reasonably likely to involve liability on the part of the company, written notice shall be given by or on behalf of the insured to the company or any of its

authorized agents as soon as possible after the accident has been brought to the notice of the insurance department of the insured at its head office in Chicago.

*Id.* at 1004. The Illinois court went on to explain,

> [The insurer] contends that to allow [the policyholder] to hide behind the literal terms of the notice provision would encourage insureds to purposely keep the designated department uninformed so as to defeat insurance carrier defenses to coverage. First, we note that [the insurer] easily could have refused to have included this type of notice requirement in the policy. Insurance carriers are certainly sophisticated enough to wield sufficient bargaining power to protect their interests, and [the insurer] cannot claim that the notice provision in issue was forced on it by [the policyholder]. *Id.*

relevant time period. Still, Wausau argues that Keystone designated two other individuals, Ralph End (Keystone general counsel) and J. Mark Hollingsworth (Valhi general counsel), to make all decisions regarding the timing of providing notice to Wausau. The actual written notice for the Ninth Avenue occurrence came from End. The actual written notice for the Impex occurrence came from Keystone outside counsel, arguably at the direction of Hollingsworth.

Keystone presents Henning's own testimony that he was the person responsible for determining when to notify Wausau of occurrences under the policy and that it was his "procedure" to put insurers on notice as soon as he received notice of a potential occurrence. Keystone Ex. 1, Henning Dep. at 24, 26067, 193–94. While certain submitted portions of Henning's deposition characterize the decision to provide notice to Wausau as coming from End or Hollingsworth, *id.* at 14–17, other portions indicate Henning would review and discuss potential claims, and Henning denied that he was "directed" to provide notice. *Id.* at 168, 193.

> Keystone argues,
>
> While Messrs. End and Hollingsworth had primary responsibility for managing the legal affairs of their companies, there is no evidence that they also assume Mr. Henning's risk management responsibilities. Mr. Henning, like any

other risk manager, relied upon the company's lawyers to provide him with information and advice about claims and occurrences. Messrs. End and Hollingsworth then consulted with Mr. Henning on the decision to give notice to Wausau of each claim.

While the Court does not agree that there is *no* evidence that End and Hollingsworth assumed risk management responsibilities, this factual issue of whether Keystone "designated" a substitute for Henning for purposes of providing notice to Wausau, along with the issue of prejudice, are disputed. At this stage, Wausau has failed to establish that there are no disputes of material fact such that it is entitled to judgment as a matter of law. Therefore, summary judgment is not appropriate with respect to notice under the primary policies.

### 2. Notice under the Umbrella Policies

The notice provisions under the Wausau excess liability policies contain a slightly different notice requirement than the primary policies. Keystone's umbrella policies between 1969 and 1979 [7] require notice when the insured has "information from which the insured may reasonably conclude that an occurrence covered hereunder involved injuries or damages, which, in the event the insured should be held liable, is likely to involve this policy." [8]

---

7. After 1979, Keystone purchased excess liability policies from a different company.

8. Keystone claims that between 1974–79, the umbrella policies contained an endorsement that, like the notice endorsement to the primary policies, only required that notice be given after the risk manager learns of the occurrence. The endorsement was printed as follows:

> Insured's Duty at the Time of Loss: Knowledge of an Occurrence by any agent or employee of the insured shall not constitute knowledge of the insured corporation [sic]

shall have received such notice of such occurrence from such agent or employee.

Keystone notes, and the Court agrees, that there is obviously some missing text from the above sentence. Keystones argues that, in light of the primary policy's notice endorsement, "apparently the phrase 'unless the insured's risk manager' is missing" from the umbrella policy's notice endorsement. Pl.'s Resp. to Def.'s Mtn for Summ J. on Late Notice, at 14. Wausau states that there is no evidence to support Keystone's version of the missing language, and that, at a minimum,

While the fundamental principles governing notice to primary insurers also apply to notice to excess insurers, "some systematic differences between primary and excess insurance lead to differences in the application of the principles." *Tribune Co. v. Allstate Ins. Co.*, 306 Ill.App.3d 779, 239 Ill.Dec. 818, 715 N.E.2d 263, 271 (1999). Generally, excess insurers are not interested in every accident, just those that may be serious enough to involve them. *Id.* "Since excess coverage is contingent on exhaustion of primary or underlying policies, excess insurers generally do not require notification until the excess policy is reasonably likely to be implicated." *Id.* at 271–72.

In analyzing several excess liability policies similar to the ones in this case, the Illinois Appellate Court has stated that the notice provisions "give the insured considerable discretion for deciding whether a claim appears reasonably likely to result in liability within the coverage," *id.* at 272; "the policies require notice only when plaintiffs reasonably believe that their probable share of the total liability will exceed the underlying insurance." *Id.* at 273.

■ The relevant inquiry, then, becomes the following:

When the timeliness of the notice is challenged by an excess insurer and a court is asked to consider whether an insured has complied with the notice provision in an excess policy which leaves the timing of notice up to the discretion of the insured, the court must determine whether the insured abused the discretion granted to it by the insur-

er, i.e., whether the insured acted unreasonably under the circumstances.

*Hartford Accident and Indemnity Co. v. Rush–Presbyterian–St. Luke's Medical Center*, 231 Ill.App.3d 143, 172 Ill.Dec. 641, 595 N.E.2d 1311, 1316 (1992). This reasonableness inquiry does not focus on the insured's evaluation of the case "to the exclusion of all else," *Kerr v. Ill. Central Railroad Co.*, 283 Ill.App.3d 574, 219 Ill. Dec. 81, 670 N.E.2d 759, 764 (1996), but rather requires the court to consider all of the facts and circumstances, "including prejudice, if any, to the excess insurer." *Id.*

Here, Wausau did not separately address Keystone's notice requirements under the umbrella policies in its Motion for Summary Judgment Based Upon Late Notice. Wausau did, however, address notice under the umbrella policies in its Reply brief, upon Keystone having raised the issue in its Response.

Keystone argues that Wausau failed in its Motion to submit evidence that Keystone had sufficient information to reasonably conclude that all triggered primary policies would be exhausted by the potential claim and the coverage of the umbrella policies would come into play. In its Reply, Wausau states that Keystone should have reasonably concluded that prompt notice was required under the excess policies because environmental claims frequently carry high investigation and remediation costs. As with notice under the primary policies, prejudice remains a factor in the reasonableness inquiry. Prejudice is not the only factor, of course. But, it is also not the only factual dispute. Therefore,

the missing language would have to include reference to not only the insurance manager but also any "other person designated by the named insured for that purpose," because this was the more precise language of the primary policies' notice endorsement.

There is simply not enough evidence before the Court on this point to adopt either party's speculation on what this endorsement to the umbrella policy requires.

summary judgment based on late notice under the umbrella policies is also denied.

## D. Motion for Summary Judgment on the Pollution Exclusion and the Absence of an Accident or Occurrence

Wausau has also moved for Summary Judgment based on certain exclusionary language in the policies it issued to Keystone. In summary, Wausau argues that the language of its policies bars coverage for routine spills and emissions, and requires an unexpected incident or accident to trigger coverage for environmental remediation. Wausau initially brought this Motion with respect to four sites— Rosen, Peoria, Impex, and Chicago Steel & Wire. The parties have settled their claims pertaining to the Rosen site, so the Court will confine its review to arguments pertaining to Peoria, Impex, and CS & W. As with the Motions for Summary Judgment on the "No Suit" and "Late Notice" issues, the majority of the parties' briefing is devoted to the Peoria site.

■ At the outset, the Court notes that its inquiry on this issue is governed by two different standards, based on the actual language contained in the Wausau policies. The policies provide coverage for damage caused by an "occurrence." The policies define occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." In occurrence-based policies, "it is the 'property damage' which must be 'neither expected nor intended from the standpoint of the insured.'" *U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926, 932 (1991). Stated another way, "even an intentional act will be covered under the policy language at issue if it causes an

unexpected or unintended result." *Atlantic Mut. Ins. Co. v. Am. Academy of Orthopaedic Surgeons*, 315 Ill.App.3d 552, 248 Ill.Dec. 342, 734 N.E.2d 50, 58 (2000).

The relevant inquiry changes somewhat for the Wausau policies after 1971: Beginning in 1972, Wausau's occurrence-based policies also contained a pollution exclusion, with an exception. The qualified pollution exclusion provides:

> It is agreed that the insurance does not apply to bodily injury, or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants upon the land, atmosphere or any water course or body of water, *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

In *Outboard Marine Corporation v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1993), the Illinois Supreme Court made clear that the term "sudden," as it was used in an identical qualified pollution exclusion, means "unexpected or unintended." *Id.* at 1220.

Because the period for which Keystone seeks coverage spans the two periods (pre–1972 and 1972–1985)[9], there are two different, but related, standards governing the Court's inquiry. To obtain coverage for occurrence under the policies issued through 1971, Keystone must show that it did not expect or intend the *resulting injury*—i.e., the contamination of groundwater. To obtain coverage under the policies issued from 1972 through 1985, when the qualified pollution exclusion was added, the *release* of the toxic substance must also be

---

**9.** Beginning July 1, 1985, Wausau's policies had a *total* pollution exclusion. However, Keystone has made clear in its briefing that it does not seek post-July 1, 1985 coverage.

unexpected or unintended. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1220 (1992).

### 1. Pre–1972 Coverage, the Occurrence Language

■ To reiterate what the Court has laid out above, the Wausau policies provide coverage for "occurrences."[10] The extension of coverage from "accidents" to "occurrences" broadens coverage and eliminates the need for an exact finding as to the cause of damages. *Aetna Cas. & Sure. Co. v. Freyer*, 89 Ill.App.3d 617, 44 Ill.Dec. 791, 411 N.E.2d 1157, 1159 (1980). Still, because of the policies' definition of occurrence, Keystone is entitled to coverage only if it can establish that its injury—in this case, property damage—was neither expected nor intended. Under Illinois Law, "an injury is 'expected' where the damages are not accomplished by design or plan, i.e., not 'intended,' but are 'of such nature that they should have been *reasonably anticipated* (expected) by the insured.'" *Calvert Ins. Co. v. Western Ins. Co.*, 874 F.2d 396, 399 (quoting *Freyer*, 44 Ill.Dec. 791, 411 N.E.2d at 1159).[11]

■ Wausau argues that it is entitled to summary judgment under the pre–1972 policies with respect to the Peoria, Impex, and CS & W sites "based upon the forseeability of the consequences of repeated, continuous practices regarding TCE." Def.'s Mtn for Summ. J. on Pollution Exclusion, at 23. Wausau urges the Court to follow a line of cases from other jurisdictions, including *Bell Lumber & Pole Co. v. U.S. Fire Ins. Co.*, 847 F.Supp. 738, 744–45 (D.Minn.1994) (applying Minnesota law) and *Bituminous Cas. Corp. v. Tonka Corp.*, 9 F.3d 51, 52–53 (8th Cir.1993) (applying Minnesota law), where the courts held that insured knew or should have known that its practices would result in environmental contamination.

In *Bell Lumber v. U.S. Fire Insurance Co.*, for example, the court held that Bell Lumber's deliberate disposal of pentachlorophenol ("penta") sludge on the grounds of its wood processing facility was not an "occurrence" and therefore precluded coverage for clean-up costs related to the disposal area. 847 F.Supp. at 744. In that case, there was undisputed evidence that employees had spilled penta in the wood processing area and deliberately dumped "penta sludge" in a separate disposal area. *Id.* at 740–42. Nearly 40 years after Bell Lumber began using penta, the company entered into a consent decree with the state environmental authorities wherein it agreed to take remedial measures and pay for the clean-up of its property. *Id.* at 742. Bell Lumber subsequently sought coverage from various CGL insurers, who argued that coverage should be denied because the contamination was not an "occurrence" and because coverage was barred by the policies' qualified pollution exclusions. *Id.* The Court separated its analysis into coverage for the costs related to the disposal area and coverage for the costs related to the contamination under the process area, where the spills occurred.

With respect to the disposal area, the court first found that Bell Lumber did not dispose of the penta sludge accidentally.

---

**10.** Wausau policies issued to Keystone prior to January 1, 1969, are accident-based policies, which provide coverage "... because of injury to or destruction of property, including the loss of use thereof, caused by accident."

**11.** The Court notes that other states have interpreted the meaning of "expected" damage to require a certainty of harm on the part of the insured greater than the standards of foreseeability. *See, e.g., Ohio Cas. Ins. Co. v. Terrace Enters., Inc.*, 260 N.W.2d 450, 452–53 (Minn.1977) (equating "expected" damage with "reckless" conduct).

The undisputed evidence showed that the company knowingly released the toxic waste by routine dumping on its site, which spanned two decades and involved thousands of gallons of penta sludge each year. *Id.* The court then found that Bell Lumber "knew or should have known that dumping penta sludge would likely cause property damage." *Id.* The Court relied on the following evidence: penta carried warning labels; Bell Lumber told its employees to avoid allowing penta to touch their skin and to avoid breathing its vapors; employees who regularly worked with the substance wore face masks and rubber suits and gloves; Bell Lumber used penta solution to kill weeds around the facility; and the wood preserving industry in general was aware that penta introduced into lakes and streams killed fish. *Id.*

Bell Lumber argued that it did not know penta was hazardous to the environment during the time it disposed of the substance on its property and that the full effects of penta were not documented, nor did the government regulate penta, until after it quit on-site disposal. *Id.* The court rejected this argument, concluding,

> Bell Lumber may not have known all the dangers of penta at the time, and may not have specifically intended to contaminate the groundwater. The evidence shows, however, that Bell Lumber knew or should have known at the time that there was a substantial probability that penta was a harmful substance and dumping the penta sludge would likely cause property damage.

*Id.* Because the property damage resulting from the deliberate dumping was not "unexpected," there was no occurrence under Bell Lumber's insurance policy.

While the Court had no difficulty concluding that contamination resulting from Bell Lumber's routine dumping was not unexpected or unintended, the court reached a different conclusion with respect to the contamination resulting from spills or leaks or both around its process area. The evidence established that there were 15 or so spills over a span of 40 years. *Id.* at 741. The spills were caused by the valves being left open, tanks being over-filled, or boil-over. *Id.* While Bell Lumber maintained that it ran a "clean operation" and that the spills were accidental, the insurers argued that the pattern of 15 or so spills negated the finding of an occurrence, that "Bell Lumber operated its wood treatment system in such a way that property damage was a substantial probability" or an "inevitable" part of its treatment operation. *Id.* at 745.

The Court found that, even though there was undisputed evidence of several spills, some major, the record did not show that Bell Lumber "knew or should have known that property damage would result from the spills. Bell Lumber acted quickly to contain and clean up the spills to avoid the property damage." *Id.* The spills appeared to be " 'accidental' as that term is ordinarily used," and there was no evidence that Bell Lumber intended to spill the penta from its treatment tanks. *Id.* The Court concluded that "regardless of the mechanism, a reasonable jury could find that the contamination under Bell Lumber's process area resulted in property damage 'neither expected nor intended from the standpoint of the insured.'" *Id.*

Here, while the bulk of the parties' pleadings are devoted to the Peoria site, Wausau argues that the facts support summary judgment with respect to Peoria, Impex, and CS & W. Wausau makes a forceful effort to paint a picture of Keystone repeatedly and intentionally dumping hazardous waste on its own property and negligently and frequently spilling at each of these sites. However, after close examination of the reports and depositions referenced by Wausau, and counter-evi-

dence cited by Keystone, the Court finds the record to be replete with disputes of fact that are material to the inquiry before it.

## A. Peoria

The principal contaminant of concern at the Peoria facility is trichlorethene, or TCE, as it is commonly known. Keystone began using TCE in the nail department for cleaning nails in vapor degreaser cabinets. The TCE was shipped to the Peoria Keystone facility by tanker truck and pumped into above ground holding tanks. One of the by-products of the degreasing process was a sludge that would contain some amount of TCE. The sludge was then placed in fifty-five gallon drums. A fork truck would pick up the full barrels and drive them to a temporary storage area.

The first factual dispute revolves around what Keystone did to dispose of the barrels of sludge. Wausau argues that the evidence establishes that Keystone deliberately disposed of the sludge on its own property, while Keystone insists that the barrels were placed in Dumpsters and disposed of offsite along with other Nail Mill waste. The evidence concerning possible on-site dumping presents both a "battle of the experts" and other types of competing evidence.

Wausau cites the report of environmental consultant Dr. Robert Aten, who conducted an investigation to determine the source of groundwater contamination. He relied on data from groundwater sampling and aerial photographs. In the report detailing his investigation, one of the "possible sources of contamination" identified is a fill area on Keystone property that was "apparently used as a disposal area between 1951 and 1969." Aten Report, Wausau Ex. C, at 109–10. The report continues, "TCE contaminated sludge and other wastes could have been disposed within the fill." *Id.* at 110. Wausau argues that other evidence supports Dr. Aten's conclusions regarding intentional dumping. It points to the deposition of a Keystone employee who said that barrels were taken from the temporary storage area, without lids, and carried away to Keystone dumps located within the Peoria plant.

However, as Keystone points out in its Response Brief, later in the same employee's deposition, the employee admits that he had never seen the dump nor did he know where it was. He admitted his information was secondhand, calling it "just hearsay." Keystone Ex. 83, Reidlinger Dep., at 160. The employee explained that he observed the barrels being loaded onto a truck and the driver of the truck saying that "they were headed to the dump;" he assumed the dump was located on Keystone property because of "the general direction" the trucks traveled. *Id.* Several other knowledgeable Keystone employees denied that an on-site dump existed and others affirmatively testified that sludge was treated like any other waste and disposed of off-site. Moreover, the report of a Keystone environmental expert, Dr. Roy Ball, states that the locations and concentrations of contamination "contradict [Wausau expert's] speculations regarding the disposal of solvent sludge on-site." Keystone Ex. 55, Exhibit 2 to Ball Affidavit, at 4.

There is also contradictory evidence that Keystone otherwise deliberately disposed of TCE sludge. Wausau cites the deposition of a Keystone employee who testifies that he did not believe there was anything wrong with putting sludge on the ground and letting it evaporate, and that he would not stop such practices.[12] However, as

12. Wausau also relies on a 1982 memo written by Dale Bennington, Keystone's environmental manager at the time. The memo states "In the past, the material was allowed

Keystone points out, this same employee testified later in his deposition that Keystone did not actually put the sludge out to evaporate, *see* Keystone Ex. 81, Buehler Dep., at 129, and other employees also denied that Keystone poured TCE sludge on the ground to evaporate.

The parties do not just dispute the facts surrounding possible on-site disposal. The evidence is equally disputed regarding the amount and nature of TCE spills at the Peoria facility. Wausau attempts to characterize TCE spills as frequent, negligent, and an accepted and expected part of plant operations, arguing that "[Keystone] spilled and/or dumped TCE around the Site, resulting in environmental contamination as the natural and ordinary consequence of these actions." Def.'s Mtn. for Summ. J., at 24. Keystone does not deny that spills occurred, but insists that they were infrequent and accidental.

Wausau again cites Dr. Aten's report, which identifies another "possible source of contamination" as TCE spills in the Wire Mill or other discharges of TCE contaminated waste being flushed through the drain system. Wausau Ex. C, Aten Report, at 109. Wausau also states "one Keystone employee confirmed that TCE and TCA that leaked and spilled from the degreasers would go down the drain in the floor of the facility, along with the wastewater." Def.'s Mtn. for Summ. J., at 6. Keystone calls this characterization of the employee's testimony a "misleading hypothetical," Pl.'s Resp. to Mtn. for Summ. J., at 7, and points out that, later in his deposition, this same employee plainly denies that solvent went down the drains, regularly or otherwise. His testimony was as follows:

Q: And would the waste water that would go through the process and then go down this water drain?

A: Not to my knowledge.

Q: Okay. Was there any way that the water and the TCE or TCA could mix together if the vapor unit was functioning properly? Do you understand my questions?

A: The only way the water could mix with the fluid—get into the fluid—is if the coils along the side leaked.

Q: And if the coils in the vapor and degreaser leaked, then the water and—would it be the TCE or TCA that could mix together?

A: Yes. And that's why it went through the water separator.

Q: Okay. And then would the—if the water coils weren't working properly and the water and the TCE or TCA would mix together, where would that end up? Would it go out the drain into the floor drain?

A: No. It would go into the water separator.

to evaporate and the sludge either disposed of on Keystone property or loaded into the general garbage and trash barrels. All of these past practices are now illegal due to Illinois Air Pollution Regulations and the U.S. EPA Hazardous Waste Regulations." However, later in the memo, Bennington writes, "No onsite disposal of this hazardous waste is known to date!" Keystone Ex. 87. When Wausau asked Mr. Bennington at a deposition about this seemingly self-conflicting memo, Bennington states that he did not mean to imply that any waste was disposed of Keystone property. He states,

Basically, the statement says, I don't know what happened to it, but those are the only two possibilities. There are no other possibilities for it. You either disposed of it onsite, or you threw it in the garbage; and I'm saying that both of those possibilities are illegal, and that's a true statement.

Keystone Ex. 88, Bennington Dep., at 130–31. While the Court is somewhat puzzled by Mr. Bennington's conflicting memo and deposition testimony, these are but two pieces of evidence, out of dozens of pieces of evidence, whose credibility and weight are best decided by a jury.

Q: Okay.

A: The water was lighter than the TCE, so it had a place where it could go down the drain and the degreaser

On the page following the excerpt cited by Wausau, there is the following exchange:

Q: To your knowledge during the process of using the vapor degreasers, was the TCA or TCE going into the floor drains?

A: To my knowledge, no.

Keystone Ex. 85, Savage Dep., at 112–13.

Wausau also states that *"Gallons* of TCE spilled onto the ground *each time* that TCE was shipped to the facility by tanker truck and pumped into above ground tanks holding several thousand gallons of the chemical, according to *several* Keystone employees that worked in the area." Def.'s Mtn for Summ J. on Pollution Exclusion, at 5 (emphasis added). Wausau supports this statement with the deposition testimony of three Keystone employees. However, two of the deposition excerpts merely describe how TCE was delivered to Keystone and transferred to its tanks. Only one of the three deponents states that "a couple of gallons would spill each time, and that was unavoidable." Wausau Ex. H, Buehler Dep., at 23. This one employee's testimony is contradicted by several other equally competent witnesses who worked in the Nail Mill, who either recall one small spill that was promptly cleaned up, or who testified that they never saw spills when TCE was pumped into the above-ground tank. *See* Pl.'s Resp., at 6.

Similarly, Wausau states that TCE spilled during the process of filling the supply tanks for each degreaser. However, the employee's testimony upon which Wausau relies for this proposition states that this type of spill happened only one time, and the witness characterized it as an accident. See Wausau Ex. F, Savage Dep., at 47, 78–85. Another employee responsible for filling the supply tanks testified that he never overflowed the tank.

While Wausau correctly points out that Keystone has failed to produce any "accident reports" or other documentation that would normally be created because of a plant accident, Keystone also cites other evidence to support its position that the totality of the evidence in this case points to isolated, accidental spills as the cause of contamination. Several Keystone employees testified that they immediately cleaned up any of the isolated spills of TCE that did occur on occasion, and Dr. Ball's expert reports point out that there are no "hot spots" indicative of recurring releases, that "[g]roundwater contaminant levels are relatively low, which is indicative of isolated, accidental spills," and that "[t]he vertical shapes of the TCE and TCA plumes in the mid-mill area can only be caused, to a reasonable degree of scientific certainty, by small, isolated releases of solvents in the degreasing area that were conveyed by the plant drains to the points of entry to the groundwater." Keystone Ex. 55, Ball Rpt., at 4, Ball Rebuttal Rpt., at 4.

As with the evidence concerning Keystone's sludge disposal practice, the evidence concerning the frequency and nature of its spills is clearly disputed, so summary judgment is not appropriate at this stage. While it may very well be the case that Keystone did intentionally dispose of TCE on its property and experience frequent spills as part of its regular operations, Keystone has put forward a sufficient amount of competent evidence to create genuine issues of material fact on these issues inappropriate for resolution by the Court.

Even if the Court could conclude at this stage that Wausau intended to release TCE into the environment, the Court is

not convinced that Keystone's pre–1972 knowledge of the risks that TCE poses to humans necessarily translates into foreseeable knowledge of TCE's capacity to contaminate the environment. After all, the facts surrounding the contaminant in *Bell Lumber* were arguably much more foreboding. There, the employees actually used the substance to kill weeds on facility premises, knew that fish had died when it spilled into the surrounding water source, and wore face masks, rubber suits, and gloves when dealing with the penta sludge.

Wausau attempts to liken the facts of this case to *Bell Lumber*. Wausau cites the deposition of an employee at the Peoria facility, Gerald Reidlinger, and argues that "[t]he facts show that Keystone knew of the dangers and toxicity of TCE, including that 'should be cleaned up immediately by employees wearing adequate personal protection equipment.'" Def.'s Mtn. For Summ. J., at 23. Reidlinger does testify that he and other employees considered TCE "dangerous" because "the fumes were bad," Def.'s Ex. G, Reidlinger Dep., at 66, 161, and that TCE was toxic because it depleted the oxygen in blood. *Id.* at 158. However, none of the excerpts of Reidlinger's testimony that Wausau cites in its brief contain any reference to "adequate personal protection equipment," nor did the Court's review of all of the submitted portions of Reidlinger's deposition reveal such a reference. Later in his deposition, Reidlinger testified that he and other employees did not wear masks or other types of protective equipment when dealing with TCE, *id.* at 168–69, and that if "[y]ou get too much, you go on the outside and get some air." Reidlinger confirms that "environmental issues just weren't on [his] radar screen" while he worked at Keystone. *Id.* at 175.

Another Peoria employee, John Buehler, testified TCE can be harmful if it enters the body, that he understood that pro-

longed exposure to high concentration of TCE fumes could make a person faint, but that there were not any risks of long-term effects on an individual's health. Def.'s Ex. H, Buehler Dep., at 78–79, 109–110, 147. Buehler also testified that printed product information from a TCE manufacturer did not warn of environmental damage and, in fact, stated that TCE-contaminated wastes "may be poured on dry sand, earth or ashes at a safe distance from occupied areas and allowed to evaporate into the atmosphere." *Id.* at 124–25, 129.

Here, the record reflects that Keystone employees at the Peoria facility knew that TCE posed potential short-term health risks to people and should not be inhaled in high concentrations for extended periods of time. While Keystone employees certainly knew that TCE posed certain dangers to people, the Court finds this is insufficient to conclude, as a matter of law, that Keystone "knew or should have known" that dumping TCE would result in *environmental contamination of its property;* i.e., that its injury was reasonably foreseeable such that it was not unexpected or unintended, and therefore not an occurrence under the policy.

## B. Impex

As with the Peoria site, the primary toxic substance "at issue" at the Impex site is also TCE. Regardless of any evidence that Wausau has presented regarding the disposal practices or other sources of TCE contamination at Impex, Wausau has not even attempted to present evidence that Impex employees who allegedly deliberately disposed of TCE on Impex property knew or should have known that TCE would contaminate the environment. Wausau's own citation of Dr. Ball's testimony that draining chemicals on the ground (which arguably happened at Impex) were accepted practices at the time

cuts against the argument that Keystone should have known that property damage would result. Therefore, Wausau is not entitled to summary judgment under the pre–1972 policies with respect to the Impex site.

### C. Chicago Steel & Wire

The remediation at CS & W is for certain volatile organic substances ("VOCs") and lead. As with the evidence it has put forth concerning Impex, Wausau has failed to produce any evidence about what CS & W knew or even should have known about the dangers of the VOCs or their "polluting potential." Regardless of any evidence concerning intentional disposal or releases of the VOCs, there is no evidence that the resulting property damage was "expected or intended from the standpoint of [Keystone]." Therefore, Wausau is not entitled to summary judgment under the pre–1972 policies with respect to the CS & W site.

### 2. Coverage Between 1972–1985, the Qualified Pollution Exclusion

Wausau argues that the qualified pollution exclusion contained in its policies beginning in 1972 (set forth above on page 21) bars Keystone's claims for coverage. Keystone maintains that its request for coverage falls within the exception to the exclusion, which still permits coverage for "sudden and accidental" discharges, dispersals, releases or escapes. While other jurisdictions have interpreted "sudden" to mean "abrupt," *see, e.g., Bell Lumber*, 847 F.Supp. at 746, in Illinois, the term "sudden," as used in the pollution exclusion, means "unexpected or unintended." *Outboard Marine*, 180 Ill.Dec. 691, 607 N.E.2d at 1220. Therefore, as stated above, the relevant consideration is "whether the insured expected and intended to discharge the particular toxic[ant] for which it now seeks coverage." *Id.* at 1204.

Under Illinois law, it is the insurer's burden to demonstrate the applicability of an exclusion in the policy. *Pekin Ins. Co. v. Miller*, 367 Ill.App.3d 263, 305 Ill.Dec. 101, 854 N.E.2d 693, 697 (2006); *Continental Cas. Co. v. McDowell and Colantoni, Ltd.*, 668 N.E.2d 59, 62 (Ill.App. 1st Dist.1996). While no Illinois case has explicitly held as much, the general rule is that if the insurer meets it burden of proving the application of an exclusion, the burden shifts to the insured to show that its claim falls within an exception to the exclusion. COUCH ON INSURANCE § 254:13 *Exceptions to Exclusions* (2006) (stating "[t]he majority of courts now appear to place the burden on the insured as to the 'sudden and accidental' exception from the pollution exclusion" and citing extensive case law).

Wausau's argument for summary judgment under the pollution exclusion relies heavily on *Fruit of the Loom, Inc v. Travelers Indemnity Company*, 284 Ill.App.3d 485, 219 Ill.Dec. 770, 672 N.E.2d 278 (Ill. App. 1st Dist.1996). In that case, an FOTL subsidiary, Universal, had used low-chlorinated liquid polychlorinated biphenyls ("PCBs") in its manufacturing process from the mid–1950s to the late 1970s. *Id.* at 280. By the late 1960s, Universal was aware of the PCBs' harmful effect on the environment. *Id.* The undisputed facts established that the pipe leaks and overflows continually occurred when " 'somebody forgot to put a clamp on a chamber door' " or when a " 'bottom clamp was left open.' " *Id* at 281. PCBs would escape through the wood and steel flooring, and make their way into the soil and groundwater. *Id.* at 281. Universal employees also testified that "drippage occurred all the time," and that "it was an ongoing problem to keep certain areas clean." *Id.*

In determining whether the qualified pollution exclusion (which is identical to

the one in this case) would bar coverage for FOTL remediation costs associated with the PCBs, the Court found that "the record demonstrates that FOTL regularly expected spills during the manufacturing process;" the spills were "ordinary and recurring parts of the business." *Id.* at 287. The Court concluded that despite evidence of some accidental spills, FOTL "nevertheless is shown to have expected such accidents in the ordinary course of business." The pollution exclusion barred FOTL's claim because coverage was never re-triggered by the exception to the exclusion. *Id.* at 288.

In the instant dispute, then, coverage will not be re-triggered under the post–1971 policies if Keystone intentionally released the contaminants into the environment or if the spills were routine and ordinary parts of the business, such that they cannot be labeled "unexpected." Wausau insists this is the case at the Peoria, Impex and CS & W sites.

### A. Peoria

For reasons fully explained above, the Court concludes that there are disputes of material fact regarding whether Keystone intentionally disposed of TCE at the Peoria site and whether the spills that occurred were truly ordinary and frequent, such that they were an expected part of the business. Therefore, summary judgment on the pollution exclusion is denied with respect to the Peoria site.

### B. Impex

■ To support its position that the TCE dispersals at the Impex site were a part of regular business and not "unexpected," Wausau relies almost exclusively on an environmental assessment report prepared by Heritage Remediation in

1989.[13] See Wausau Ex. N. The report confirms that there were several areas of contamination at the site and identifies possible contaminant sources. The report states that "[u]ncovered scrap metal storage bins are a continuing source of contamination", and that "[r]esidual oils (and possibly solvents) present in the hoppers frequently leak onto the ground surface." *Id.* at 17. Heritage concludes: "Past storage of drums of spent solvent or oily (or oil-containing debris) wastes in the gravel area west of the manufacturing plant, especially at certain locations . . . are another potential source of the organic contamination disclosed during this investigation." *Id.*

In its Response, Keystone has not presented significant counter evidence. Keystone essentially urges the Court to find the Heritage Report an insufficient basis for summary judgment, stating of the report: "These finding were made from the personal observations of Heritage employees, none of whom have been deposed in this case, of the operations and condition of the Impex site as of the late 1980s." Pl.'s Resp., at 39. Keystone also argues that "Dr. Ball will testify that the practices referred to in the Heritage Report were the accepted practices of the time and that no one expected them to cause groundwater contamination." This testimony may have helped Keystone establish that it has suffered an "occurrence," that is, that it did not expect or intend the contamination of its property. However, the relevant inquiry under the pollution exclusion is not whether the *contamination* was expected, but rather whether the *releases* were expected.

Keystone also makes brief reference to the deposition of Alan Bruner, an employ-

---

13. Wausau does cite other authority. However, that authority is either irrelevant (the Bennington memo which addresses only Peoria

and not Impex) or does not address actual practices at the Impex site.

ee at the Impex facility between 1977 and 1990, who testified that he was not aware of any TCE or contaminated wastes being intentionally dumped onsite. However, in its Reply to Keystone's Response, Wausau quotes a different portion Bruner's testimony in which he explains that he was not aware of any incident reports that were prepared relating to the release of TCE. Another Keystone employee responsible for property management and environmental issues denied that he had ever "seen any evidence in the form of documents or discussion with people or any other information that would support the conclusion that the presence of these contaminants in the groundwater was a product of some unforseen circumstance." Def.'s Reply, at 9–10.

Here, the evidence pertaining to deliberate dumpings or pourings of contaminants at the Impex facility, or routine spills and leaks of which Keystone was aware, is thinner than the evidence presented regarding the Peoria facility. While the environmental consultant's report may be speculative in nature about the causes of contamination, knowledgeable Keystone employees are unable to identify any unexpected accidents or unexpected occurrences, which supports Wausau's position that leaks and spills of the contaminants were an ordinary occurrence.

Under Illinois law, Wausau bears the burden of establishing that the pollution exclusion bars coverage. Wausau has done this by showing that the property damage for which Keystone seeks coverage has "arisen out of the discharge, dispersal, release or escape" of the pollutant at issue here. Keystone bears the burden of "establishing that the exception to the exclusion applies, that is, that any discharges, dispersals, releases or escapes" that caused the contamination were unexpected or accidental. Keystone has failed to meet this burden. Keystone has not set

forth any competent evidence to dispute the Report nor has it proposed any counter-theories regarding the causes of contamination at Impex, and therefore has not established that there are genuine disputes of fact regarding whether releases at Impex were unexpected. Summary judgment on the pollution exclusion with respect to the Impex site is granted.

## C. Chicago Steel & Wire

As with Impex, the parties have presented relatively little evidence regarding the actual practices at the CS & W facility. Here, Wausau relies exclusively on an environmental site assessment report completed by Consulting Solutions Inc ("CSI") in 2000. *See* Wausau Ex. O. The Report identifies "Potential On–Site Concerns." *Id.* at VALCSW 0679. It states that "[a]reas of past spills and dumping were pointed out at the time of CSI's site visit. 'Midnight dumping' as well as significant historical dumping and spillage were also reported.'" *Id.* The report concludes, "[t]he nature of the industrial operations conducted at [CS & W] utilized significant quantities of hazardous materials ... [i]t is certain that various spills and improper disposal practices (certainly by today's standards) have occurred at the subject. In addition to dumping and spills, it is possible that the interior network of pits, vaults and trenches have leaked into the subsoil...." *Id.* at 0680. Wausau also cites the CSI Report's reference to the 1997 IEPA NOV, which accuses CS & W of improper land use and dumping practices. However, the Report itself notes that "minimal additional information regarding the validity of the [IEPA's accusations] is provided."

In its Response, Keystone puts forth minimal counter-evidence, again attacking the third party consultant's report as an insufficient basis upon which to grant sum-

mary judgment. Keystone also cites the testimony of one CS & W employee, who states that hazardous wastes were disposed of offsite and that there were a few accidental spills that were cleaned up immediately. In its Reply to the Keystone Response, Wausau provides an excerpt from the testimony of a CS & W property manager, who confirms that he never saw any documents that would support the conclusion that the lead present in the CS & W soil was a result of an accident or was otherwise unexpected.

Here, the CSI Report presents evidence that both intentional dumping and regular spills occurred at CS & W. Keystone has simply failed to present evidence that detracts from this, nor has it proposed any supported counter-theories regarding the causes of contamination at CS & W. Keystone has not established that there are genuine disputes of fact regarding whether the releases at Impex were unexpected. Summary judgment on the pollution exclusion with respect to the CS & W site is granted.

### 3. Conclusion

With respect to coverage under the pre–1972 Wausau policies, Wausau's Motion for Summary Judgment based on the absence of an accident or an occurrence is denied with respect to Peoria, Impex, and CS & W. With respect to coverage between 1972 and July 1, 1985, Wausau's Motion for Summary Judgment based on the pollution exclusion is denied with respect to Peoria and is granted with respect to Impex and CS & W.

### CONCLUSION

For the reasons set forth above, Wausau's Motion for Summary Judgment on the issue of "no suit" [# 72] is DENIED; Wausau's Motion on the issue of late notice [# 38] is DENIED; Wausau's Motion on the issue of the pollution exclusion or the absence of an accident or occurrence [# 70] is GRANTED IN PART and DENIED IN PART.